## ELIZABETH BALLARD ET AL. *v*. MISSISSIPPI COTTON OIL COMPANY.

1. CORPORATIONS. *Master and servant. Constitutional law. Equal protection of the laws. Laws 1898, ch. 66, p. 85. Constitution 1890, sec. 193. Constitution of the United States. Amendment XIV.*

> The act of 1898 (Laws, ch. 66, p. 85), providing that every employe of any corporation shall have the same rights and remedies for an injury suffered by him from an act or omission of the corporation or its employes as are allowed to other persons not employes, where the injury results from the negligence of a superior agent or officer, or of a person having a right to control or direct the services of the party injured, and also when the injury results from the negligence of a fellow-servant, etc., and that knowledge of defective appliances, etc., shall constitute no defense, is unconstitutional, as imposing restrictions on all corporations without reference to any differences arising out of the nature of their business, not imposed on natural persons, and, therefore, denying corporations the equal protection of the laws.

81 507
83 434

81 507
84 28
o84 144

81 507
88 344
88 345
88 346
88 347
88 350
f88 303

81 507
f91 356

81 507
f94 848

2. SAME.   *Construction.*

Such act cannot be held constitutional by construing it to apply only to corporations engaged in a hazardous business, and by permitting the court in such case to determine from the evidence whether the particular business engaged in was hazardous.

3. SAME.   *Severance.   Test.*

Whenever a statute contains on its face both constitutional and unconstitutional provisions that are not interdependent, a severance between the two and the striking out of the latter are allowable, there being in such case elements between which severance is practicable, but resorting to the evidence in a case to determine whether a subject is within the supposed intent of the general terms employed in the act, which by their plain meaning render the same unconstitutional, is not a severance, but an improper limitation of such terms by judicial construction operating to interpolate in the act what it does not contain.

FROM the circuit court of Yazoo county.

HON. ROBERT POWELL, Judge.

The appellants, Elizabeth Ballard and others, were plaintiffs and the appellee defendant in the court below.

This was an action brought by Elizabeth Ballard and her husband and their three children against the Mississippi Cotton Oil Co., a corporation, to recover damages for the death of John Ballard, who was the son of Elizabeth Ballard and her husband, and the brother of the other plaintiffs. John Ballard was an employe in defendant's cotton seed oil mill, and while oiling the machinery, in the discharge of his duty, fell, and was killed by a revolving shaft in consequence of the insufficiency and unsafe condition of a step-ladder he was using at the time, which appliance had been furnished to him by defendant for the use to which he was putting it. He had knowledge of its unsafe condition, and on the conclusion of the evidence the same was excluded on the motion of defendant, and a verdict for defendant directed by the court. Chapter 66 of the acts of 1898, under which the plaintiffs claimed that their action was maintainable, together with sec. 193 of the constitution of 1890 are set out in the opinion of the court.

From the judgment entered in favor of defendant, plaintiffs appealed to the supreme court.

*R. N. Miller*, for appellants.

We might say, in response to questions put by the court, that in all matters of doubt about the constitutionality of an act the rule is uniform that the doubt must be solved in favor of its constitutionality. The first query of the court amounts, in our conception, to asking whether the classification must in every instance be based upon " some difference inhering in the very nature of the business, as, for instance, the dangerous character of steam as an agency " (as an element of danger). We say, " No." This precise question was answered by the supreme court of the United States in *Missouri R. R. Co.* v. *Mackey*, 127 U. S., 210 (8 Sup. Ct., 1163; 32 L. Ed., 107), where, speaking of the right of classification under the fourteenth amendment, the court says : " As said by the court below, it is simply a question of legislative discretion whether the same liabilities shall be applied to common carriers by canal and stage coaches, and to persons and corporations using steam in manufactories." This is a clear statement, by the court whose opinions must control this question, that the basis of classification need not " inhere in the nature of the business," and that the agency of steam has nothing to do with it. This matter is one of legislative discretion, if " there is some difference which bears a just and proper relation to the act in respect to which the classification is proposed." *Gulf, C. & S. F. R. Co.* v. *Ellis*, 165 U. S., 155 (17 Sup. Ct., 255; 41 L. Ed., 666). The only ground for classification deducible from all the decisions of the supreme court of the United States is that the selection must be based on some ground which addresses the reason, and not a mere arbitrary selection. *Id.*; *Magoun* v. *Bank*, 170 U. S., 293-296 (18 Sup. Ct., 594; 42 L. Ed., 1037). Again, in *Missouri R. R. Co.* v. *Mackey*, 127 U. S., 208 (8 Sup. Ct., 1162; 32 L. Ed., 107), the court

holds that "it cannot be successfully contended that the state may not prescribe the liabilities under which corporations created by its laws shall conduct their business."

It is decided by a dozen cases in the supreme court of the United States that the very fact that corporations get their rights and privileges from the state gives the right to the state to dictate the terms on which they may transact their business. This right, of course, does not apply to individuals. Now, it is clear to me that the basis of classification as to liability to employes is one of those terms the state may dictate to corporations, simply and solely because the state gives life to the corporation, gives it rights and privileges it does not give to individuals, gives it power to limit its liability—perpetual life and a number of privileges it does not give private persons. The servant of the master who is a private individual has the superintending care and criminal accountability of the master as a guaranty for his safety. If the master kills him by gross negligence, he may be indicted for murder or manslaughter, and deprived of liberty. The master's liability for damages is unlimited. All this guaranty of safety is denied the servant of a soulless corporation, which can only be fined, if indicted for his killing. This is an essential substantial "difference, which bears some just and proper relation to the classification." 165 U. S., 155 (17 Sup. Ct., 255; 41 L. Ed., 666). The justice, the sufficiency, of the reason on which the classification is based is a matter of legislative discretion. See authorities cited in printed brief in full, pages 9 and 10. "The constitution is not violated by special legislation applying equally to all artificial bodies." *Pacific Express Co.* v. *Seibert*, 142 U. S., 352 (12 Sup. Ct., 250; 35 L. Ed., 1035.) See authorities cited in support of this on page 7, printed brief for appellant. *Union Cent. Life Ins. Co.* v. *Chowning* (Tex. Sup.), 26 S. W., 982 (24 L. R. A., 505); *McPherson* v. *Blacker*, 146 U. S., 38-40, (13 Sup. Ct., 3, 36 L. Ed., 869).

The precise question put by the court, as to whether the

basis of classification need "inhere in the very nature of the business," is answered by all the above array of authority— that it need not.   The confusion in the mind of the court arises from considering the case of *Tullis* v. *Lake Erie R. R. Co.*, 175 U. S., 353 (20 Sup. Ct., 136; 44 L. Ed., 192), by itself, and not with all the cases cited by us.   In this case, whilst the statute of Indiana embraced all corporations (not municipal), the case was a suit by a railroad employe, and the court simply contented itself by deciding the case in hand, and holding that the act was at least constitutional as to railroad employes. That is all the court decided.   This case simply held that the statute was separable, and was not in conflict with the four- teenth amendment, so far as railroads is concerned.   It never undertook to deny the right of the state to "dictate the terms upon which artificial bodies created by it may conduct their business."   It never overlooked or criticised the following cases, to wit: *Missouri R. R. Co.* v. *Mackey*, 127 U. S., 205 (8 Sup. Ct., 1161; 32 L. Ed., 107), which, among other things, distinctly held: "When legislation applies to particular bodies or associations, imposing upon them additional liabilities, it is not open to the objection that it denies them the equal pro- tection of the laws, if all  .  .  .  brought under its influence are treated alike under the same conditions," or *Gulf, C. & S. F. R. R.* v. *Ellis*, 165 U. S., 150 (17 Sup. Ct., 255; 41 L. Ed., 666.)

As to the second proposition by the court, as to whether the statute is separable, I answer: It is as much so in this case as it was in the *Tullis case*, 175 U. S., 348 (20 Sup. Ct., 136; 44 L. Ed., 192).   It simply happened there that the court had repeatedly held that classification of railroads by themselves was sound, discreet and proper classification.   It has never been held that oil mills are; but the dangers attending employes of oil mills are certainly known to be as great as those attending railroad employes.   However, I do not think it necessary to discuss that question.   I am so perfectly confident that the

single ground of classification of all corporations is so sound
and reasonable that the statute ought to be upheld on that
ground.   The state gives the corporation existence, gives it life
and privileges, and can, therefore, dictate its special liabilities
as a class.   Not only so, but this reasoning is clear when we
add the rights and protection given by the individual master to
his servant, which the servant of any corporation is denied, as
the just reason why the state should provide special liabilities
of the one master and not of the other.   This is a just reason,
a reason having relation to the right to classify, and not a
mere arbitrary selection, which alone could make the classifica-
tion illegal.   I repeat: The sufficiency or hardship of the clas-
sification is a matter of legislative discretion and remedy.   See
page 208, about middle of page, 127 U. S., and page 1163 (8
Sup. Ct.; 32 L. Ed., 107).   This case answers every inquiry
put by the court.

*R. N. Miller* and *Campbell & George*, for appellants.

This case has been remanded to the docket for reargument
of the question of the constitutionality of ch. 66 of the acts
of the legislature of Mississippi of 1898.   Section 193 of the
constitution of Mississippi, as is well understood, overturns
the law, as it had existed prior to its adoption, as to the liability
of a railroad master to his servant for injuries received in the
service of such master.   The last paragraph of this sec. 193
provides:  " The legislature may extend the remedies herein
provided for to any other class of employes."   It will be noted
that no classification is attempted by the constitution, but to
what other class of employes this remedy shall be extended is
left to legislative discretion.   By ch. 66, p. 85, acts 1898, the
remedies provided by sec. 193 are extended to " employes of
all corporations."

It is contended for appellee that this classification of employes
of all corporations is violative of the equality clause of the
fourteenth amendment to the constitution of the United States,

which guarantees to every person equal protection of the laws, and that his life, liberty or property shall never be taken without "due process of law." The power is given the legislature to extend to any other class, and the extension is made to all other corporations by sec. 193. It therefore follows that if ch. 66, p. 85, acts 1898, is violative of the fourteenth amendment, because it extends special remedy to a special class, the last paragraph of sec. 193 of the constitution of Mississippi also is. It is freely admitted that corporations are "persons," within the meaning of the fourteenth amendment, and as such entitled to equal protection of the laws thereby guaranteed. There is absolutely no dispute between counsel for appellee and ourselves on the proposition stated on page 18 of the brief, as follows: "The rule we deduce from the different decisions of the supreme court of the United States' construing the fourteenth amendment is this: That the legislature of a state can make a reasonable classification of persons, and impose certain liabilities [meaning special liabilities] upon the persons within this classification, but it cannot arbitrarily [without any reason] single out a class of persons or corporations and impose [special] liabilities upon them." With the addition we make in brackets to the statement of counsel for appellee, we heartily agree that the rule deduced by them is in perfect accord with our own deductions from the enunciations of the supreme court of the United States upon the fourteenth amendment. It is further freely admitted that in the case of *Gulf, C. & S. F. R. R.* v. *Ellis*, 165 U. S., 150 (17 Sup. Ct., 255; 41 L. Ed., 666), the supreme court decided that "the mere fact of classification is not sufficient to relieve a statute from the reach of the equality clause of the fourteenth amendment, and in all cases it must appear, not merely that the classification has been made, but also that it is based upon some reasonable ground, something which bears just and proper relation to the attempted classification, and is not a mere arbitrary selection."

These principles are thoroughly established : First. The

fourteenth amendment was not designed to restrain the state's power of classification for special laws. 165 U. S., 155 (17 Sup. Ct., 255; 41 L. Ed., 666); 127 U. S. 205 (8 Sup. Ct., 1161; 32 L. Ed., 107); *Walston* v. *Nevin*, 128 U. S., 578 (9 Sup. Ct., 192; 32 L. Ed., 544); *New York & N. E. R. Co.* v. *Town of Bristol*, 151 U. S., 556 (14 Sup. Ct., 437; 38 L. Ed., 269); *Bell's Gap R. Co.* v. *Pennsylvania*, 134 U. S., 232 (10 Sup. Ct., 533; 33 L. Ed., 892); *Pacific Exp. Co.* v. *Seibert*, 142 U. S., 339 (12 Sup. Ct., 250; 35 L. Ed., 1035); *Grozza* v. *Tiernan*, 148 U. S., 657 (13 Sup. Ct., 721; 37 L. Ed., 599); *Columbus Southern Ry. Co.* v. *Wright*, 14 Sup. Ct., 396 (38 L. Ed. 238); *Merchant* v. *Railroad Co.*, 153 U. S., 380 (14 Sup. Ct., 894; 38 L. Ed., 751); *St. Louis & S. F. Ry. Co.* v. *Mathews*, 165 U. S., 1 (17 Sup. Ct., 243; 41 L. Ed., 611.) Second. This classification must be reasonable, and not arbitrary—"must rest on some difference which bears a just and proper relation to the act in respect to which the classification is proposed," etc. 165 U. S., 155 (17 Sup. Ct., 255; 41 L. Ed., 666). The only issue, therefore, between ourselves and counsel for appellee is : Does ch. 66, p. 85 of acts of 1898, arbitrarily or unreasonably classify the employes to whom its benefits are extended? Does this classification of employes of all corporations repose upon some difference which bears a just and proper relation to the act ; that is, to the remedies extended by the act?

The case of *Gulf, C. & S. F. R. R.* v. *Ellis,* 165 U. S., 150 (17 Sup. Ct., 255; 41 L. Ed., 666), presented the questions whether the act of the legislature of Texas, imposing upon the railroads the payment of $10 attorney's fees as part of the costs in any case of failure to pay claims duly presented under $50, was a denial of equal protection of the law. It is noted the court was divided, the majority holding the act was void ; but Justices Gray and White and Chief Justice Fuller dissented. In the opinion of the majority it is said: "While it is true the states may classify, yet it is true such classification

cannot be made arbitrarily. The state may not say that all white men shall be subjected to the payment of the attorney's fees, and all black men not. It may not say that all men beyond a certain age shall alone be subjected, and all men possessed of certain wealth. These are reasons which do not furnish any proper basis for the attempted classification." Further, it is said in the opinion that "the legislature may fix the age at which persons can be competent to contract for themselves, but no one will claim that competency to contract can be made to depend upon stature or color of the hair." It is further stated in the opinion, on page 157 (165 U. S., p. 257; 17 Sup. Ct., 41 L. Ed., 666): "It is further said this penalty is cast upon corporations; that to them special privileges are granted, and therefore upon them special burdens may be imposed. It is a sufficient answer to say that the penalty is not imposed upon all corporations. The burden does not go with the privilege. Only railroads, of all corporations, are selected." This is a clear intimation that, if all corporations had been burdened with the penalty, the majority of the court would have held it a reasonable and proper exercise of the power of classification. The dissenting opinion on p. 167, 165 U. S.; and p. 261, 17 Sup. Ct.; 41 L. Ed., 666, says: "The legislature of a state must be presumed to have acted from lawful motives, unless the contrary appears from the face of the statute"—and proceeds to sustain the classification with great force.

In *Missouri R. R. Co.* v. *Mackey*, 127 U. S., 205 (8 Sup. Ct., 1161; 32 L. Ed., 107), the same question of equal protection and classification was presented by the statute of Kansas, which provided: "Every railroad company organized or doing business in this state shall be liable for all damages done to any employe of such company in consequence of any negligence of its agents, or by any mismanagement of its engineers or other employes, to any person sustaining such damage." The rule up to that time had been, in Kansas as

here, that the master was not liable to employes for injuries caused by fellow servants ; and the opinion proceeds :   "The rule of law is conceded where the person injured and the one by whose negligence or incompetency the injury is caused are fellow servants in the same common employment and acting under the same immediate direction.   *Chicago, M. & St. P. Ry. Co.* v. *Ross,* 112 U. S. 377 (5 Sup. Ct., 184; 28 L. Ed., 787.)   Assuming that this rule would apply to the case presented, but for the law of Kansas of 1874, the contention of the company, as we understand it, is that the law imposes upon railroad companies a liability not previously existing, in the enforcement of which their property may be taken, and thus authorizes the taking of property without due process of law, in violation of the fourteenth amendment.   The plain answer to this contention is that the liability imposed by the law of 1874 arises only from injuries subsequently committed.   It has no application to past injuries, and it cannot be successfully contended that the state may not prescribe the liability under which corporations created by its laws shall conduct their business in the future, where no limitation is placed upon its power in this respect by their charters.   Legislation to this effect is found in the statute books of every state.   The hardship or injustice of the law of Kansas of 1874, if there be any, must be relieved by legislative enactment.   The only question for our examination, as the law of 1874 is presented to us in this case, is whether it is in conflict with clauses of the fourteenth amendment.   The supposed hardship and injustice consists of imputing liability to the company, where no personal wrong or negligence is chargeable to it or its directors.   But the same hardship and injustice, if there be any, exists where the company, without any wrong or negligence on its part, is charged with injuries to passengers.   Whatever care and precaution may be taken in conducting its business or selecting its servants, if injury happen to passengers from the negligence or incompetency of the servants, responsibility therefor at

once attaches to it.   The utmost care on its part will not re-
lieve it from liability, if the passenger injured be himself free
from contributory negligence.   The law of 1874 extends this
doctrine, and fixes a like liability upon railroad companies,
where injuries are subsequently suffered by employes, though
it may be by the negligence or incompetency of fellow servants
in the same general employment and acting under the same
immediate direction.   That its passage was within the com-
petency of the legislature we have no doubt.   The objection
that the law of 1874 deprives the railroad company of the
equal protection of the law is even less tenable than the one
considered.   It seems to rest upon the theory that legislation
which is special in its character is necessarily within the con-
stitutional inhibition ; but nothing can be further from the
fact.   The greater part of all legislation is special, either in
the objects sought to be attained by it or in the extent of its
application.   Such legislation does not infringe upon the clause
of the fourteenth amendment requiring equal protection of the
laws, because it is special in its character.   If in conflict at all
with that clause, it must be on other grounds.   .   .   .   And
when legislation applies to particular bodies or associations,
imposing upon them additional liabilities, it is not open to the
objection that it denies them the equal protection of the laws,
if all persons brought under its influence are treated alike under
the ·same conditions.   A law giving to mechanics a lien on
buildings constructed or repaired by them for the amount of
work, and a law requiring railroad companies to erect and
maintain fences along their roads separating them from lands
of adjoining proprietors, so as to keep cattle· off their tracks,
are instances of this kind.   Such legislation is not obnoxious
to the fourteenth amendment, if all persons subject to it are
treated alike, under similar circumstances and conditions, in
respect to both the privileges conferred and the liabilities im-
posed.   As said by the court below, it is simply a question of
legislative discretion whether the same liabilities shall be ap-

plied to common carriers by canal and stage coaches and to persons and corporations using steam in manufactories. See *Pacific Railway Co.* v. *Humes*, 115 U. S., 512-523 (6 Sup. Ct., 110; 29 L. Ed. 463); *Barbier* v. *Connolly*, 113 U. S., 27 (5 Sup. Ct., 357; 28 L. Ed., 923); *Soon Hing* v. *Crowley*, 113 U. S., 703 (5 Sup. Ct., 730; 28 L. Ed., 1145.) The case was reaffirmed in *Chicago, K. & W. R. Co.* v. *Pontious*, 157 U. S., 209 (15 Sup. Ct., 585; 39 L. Ed., 675), holding that special legislation for protection to railroad employes justified the classification.

These two last cases are authority for sec. 193 of the constitution, except the last paragraph now under consideration, to-wit: "The legislature may extend the remedies within provided for to any other class of employes." In *Pacific Express Co.* v. *Seibert*, 142 U. S., 352 (12 Sup. Ct., 250; 35 L. Ed., 1035), it is held: "The constitution is not violated by special legislation applying equally to all artificial bodies." *State* v. *Moore*, 104 N. C., 714 (10 S. E., 143; 17 Am. St. Rep., 696); *Allen* v. *Pioneer-Press. Co.*, 40 Minn., 117 (41 N. W., 936; 3 L. R. A., 532; 12 Am. St. Rep., 707). This case is approved in *Adams Exp. Co.* v. *Ohio*, 165 U. S., 194 (17 Sup. Ct., 305; 41 L. Ed., 683); *Western Union Tel. Co.* v. *Indiana*, 165 U. S., 109 (17 Sup. Ct., 345; 41 L. Ed., 725); *Magoun* v. *Ill. Trust Co.*, 170 U. S., 295 (18 Sup. Ct., 594; 42 L. Ed., 1037) (this is the classified inheritance tax case); 63 Ark., 589 ; and the vast number of cases cited on pages 81 and 82, vol. 12, notes on U. S. supreme court reports, by Judge Rose; and in the list he cites the case of *Tullis* v. *Lake Erie Railroad Co.*, 175 U. S., 353 (20 Sup. Ct., 136; 44 L. Ed., 192). In this last case the question presented was precisely the same question in the case at bar. It was a statute of Indiana providing that "every railroad or other corporation, except municipal, shall be liable for damages," etc. Our constitution (sec. 193), together with ch. 66, p. 85, acts of 1898, are precisely like this Indiana statute, im-

posing liabilities under the same conditions and same circum-
stances and same classification.   The United States supreme
court, in *Tullis* v. *Lake Erie R.  Co.*, held this Indiana statute
valid, and not obnoxious to the equality clause of the four-
teenth amendment.   It is true that the precise case was a suit
for damages by an employe of a railroad corporation.   It is
also true that the question of the application to the employe of
"other corporations" was pretermitted—not distinctly de-
cided at all; but it was held valid that far, without reference
to "other corporations."

We now say that the classification made by ch. 66, p. 85,
acts of 1898, was reasonable, and not arbitrary, and rests on
"some difference which bears a reasonable and just relation to
the act in respect to which the classification is proposed."
There are several substantial reasons why a different liability
should be imposed on corporate masters from individual
masters :

(1)   It is the duty of all masters to take every reasonable
precaution for their servant's safety, by selecting with due
care reliable and competent fellow servants, furnishing safe
places to work, safe appliances, in fact everything dictated by
prudence to not expose him to peril.   These are elementary
rules growing out of the relation of master and servant.
These duties lie equally upon corporate and individual masters.
It is held in *Texas & Mexican R. R. Co.* v. *Whitmore*, 11
Am. & Eng. R. R. Cases, 195:   "The duty a corporation
owes to its servants is like that of an individual master, except
that one performs it in person, and the other by agents."   In
the one case the servant is protected by moral conscience and
personal care of his master for his safety, and in the other
case he is at the mercy of the agents of a "soulless" master.
This itself is a "difference" which is reasonable, and alone
upon which the classification can safely stand.

(2) Corporations are artificial bodies created by the state,
upon which special favors of limited liability, etc., are con-

ferred, and, as said by the supreme court of the United States in 127 U. S., 208 (8 Sup. Ct., 1162; 32 L. Ed., 107): "It cannot be successfully contended that the state may not prescribe the liabilities under which corporations created by its laws shall conduct their business in the future, when no limitation is placed upon its power in this respect by their charters. Legislation to this effect is found in the statute books of every state. The hardship or injustice of the law must be relieved by the legislature." All natural persons "are born free and equal," but all artificial persons are not. We maintain that if there be any reason for the classification, its sufficiency is a subject purely of legislative discretion, and this is the ground of the dissenting opinion in *Gulf, C. & S. F. R. R.* v. *Ellis*, 165 U. S., 155 (17 Sup. Ct., 255; 41 L. Ed., 666.)

It is contended for appellee here that, because all corporations do not use the dangerous agency of steam, etc., therefore the classification is without reason; in other words, that there are no other reasonable grounds upon which all corporations can be classified. In 127 U. S., 210 (8 Sup. Ct., 1163; L. Ed., 107), the court answers this very contention by saying: "It is simply a question of legislative discretion whether the same liabilities shall be applied to carriers by canals and stage coaches (which do not use steam) and to persons and corporations using steam in manufactories"—citing 115 U. S., 512, 523 (6 Sup. Ct., 110; 29 L. Ed., 463; 113 U. S., 27; 5 Sup. Ct., 357; 28 L. Ed., 923); *Boyer* v. *Boyer*, 113 U. S., 703 (5 Sup. Ct., 706; 28 L. Ed., 1089). To the same effect is the case of *Petit* v. *Minn*, 177 U. S., 164 (20 Sup. Ct., 666; 44 L. Ed., 716), holding an act prohibiting barber shops from keeping open on Sunday, in the interest of the employes of such shop, within the legislative discretion, and not violative of the fourteenth amendment. To the same effect is the case of *L'Hote* v. *New Orleans*, 177 U. S., 587 (20 Sup. Ct., 788; 44 L. Ed., 899), that a city ordinance was within legislative discretion which

confines the residence of certain persons to certain particular parts of the city.

The courts of the country, including the supreme court of the United States, are bound by certain fixed rules of law, and can no more arbitrarily decide a classification unreasonable than the legislature can declare it unreasonable. We repeat, the sufficiency of the reason is not a question of judicial discretion, but is one of legislation discretion. *State* v. *Cunningham*, 83 Wis., 90 (53 N. W., 35; 17 L. R. A., 145; 35 Am. St. Rep., 27); *People* v. *Kirk*, 162 Ill., 138 (45 N. E., 830; 53 Am. St. Rep., 277); *Lommen* v. *Minneapolis Gas Co.*, 65 Minn., 196 (68 N. W., 53; 33 L. R. A., 437; 60 Am. St. Rep., 450). I concede that the courts have the power to say that there is no reason for a classification, and that the action of the legislature is arbitrary and despotic, but if there be "some difference," some reason for the classification, then the courts will uphold the action of the legislature. "It is sufficient to satisfy the demands of the constitution, if the classifications were practical, and not arbitrary, and that the classification of the Missouri statute was not objectionable in view of the difference between fire insurance and other insurance." *Tullis* v. *Lake Erie R. R.*, 175 U. S., 353 (20 Sup. Ct., 136; 44 L. Ed., 192; 109 Fed., 389); *Magoon* v. *Ill. Trust Co.*, 170 U. S., 287 (18 Sup. Ct., 594; 42 L. Ed., 1037). The presumption of proper exercise of legislative discretion and the constitutionality of an act must prevail until it is shown there is no reason for the classification at all. Appellee can not do this in the case at bar.

The instances of hardship given by counsel for appellee here —of the planting company, incorporated, and the individual planter, and the sawmilling company, incorporated, and the individual sawmill master—and the discriminating imposition of liabilities by ch. 66, p. 85, of the acts of 1898, do not meet the argument. Classification by the legislature in the imposition of liabilities, we all agree, is within the power of the legislature of the state, and not denial of " equal protection of

the laws.'' Any and all classifications mean discrimination *ex necessitate.* Apparent hardship and discrimination do not, therefore, work denial of '' equal protection of the laws.'' These supposed hardships are answered by the corresponding benefits derived from the act of incorporation by the state, and they are also answered by the supreme court of the United States in *Missouri Railroad Co.* v. *Mackey,* 127 U. S., 208 (8 Sup. Ct., 1163; 32 L. Ed., 107): ''The hardships [discrimination] . . . must be relieved by legislative enactment.''

*T. H. Campbell,* for appellants.

At the last term of this court this case was remanded for reargument on the following points:

First, whether the act embracing all corporations and no natural persons was unconstitutional. Should not the act on its face have classified the corporations in regard to the nature of the business engaged in by corporations? We think not. Any attempt to classify the corporations as to the nature of its business must necessarily have rendered it obnoxious to the fourteenth amendment to the United States constitution, unless the classification is so general that it amounts to about the same as the act under consideration. To illustrate: Suppose the act had said employes of all corporations engaged in manufacturing cotton into yarn and the manufacturing cotton seed into oil, which use steam as an agency; would not this have been arbitrary classification? Why single out those engaged in the manufacturing of cotton into yarn and those engaged in the manufacturing of cotton seed into oil? If the criterion by which the act shall be adjudicated constitutional or unconstitutional is the dangerous character of business the corporation is engaged in, can the court say that the manufacture of cotton into yarn by the instrumentality of steam is more or less dangerous than the manufacture of logs into lumber or lumber into furniture

by the instrumentality of steam ? Again, can the court say that machinery in a cotton mill or in an oil mill run by water is less dangerous than the same machinery run by steam. Is not this an arbitrary classification ? Again, suppose the act had said the employes of any corporation engaged in a hazardous or dangerous employment; how is this court to determine what business was dangerous, except from the evidence in each particular case, unless, as in the case of railroads, it be notorious from general knowledge of that business that it subjects employes to dangerous and hazardous situations. The constitution of the state gives the legislature authority to extend its provisions to any other class of employes. Section 193 of the constitution. It is well known that the intention was to give the legislature this authority, so as to protect employes of corporations other than railroad, if it was found that these corporations were neglectful of the rights and safety of their employes. Shall this authority be made nugatory because of the impossibility of enumerating the different corporations whose business is such that they are tempted to disregard the safety of their employes? The real question is, does the fact that natural persons are not included in the act render it unconstitutional ? We think not, because the classification of corporations is in itself sufficient, and not arbitrary. In the case of *Pembina Mining Co.* v. *State of Pennsylvania*, 125 U. S., 189 (8 Sup. Ct., 737; 31 L. Ed., 650), the court says: ''The equal protection of law which these bodies [corporations] may claim is only such as is accorded similar associations within the jurisdiction of the state.''

The mere fact that natural persons are not included in the act does not render it obnoxious to the provisions of the fourteenth amendment. If so, why does the supreme court, in the case of *Tullis* v. *Erie R. R. Co.*, 175 U. S., 348 (20 Sup. Ct., 136; 44 L. Ed., 192), uphold almost a similar statute as to railroads. The language of the Indiana act was '' railroad

and other corporations.'' It did not include individuals. There are a number of individuals in the United States who have the means to operate railroads, and doubtless there are instances where railroads are owned and operated by individuals; yet the supreme court of the United States in the above cited case holds that such legislation as under consideration now is not in contravention of the constitution. The illustrations of opposing counsel will apply just as forcibly to an individual operating a railroad as they do to a sawmill and commercial corporation. The case of *Tullis* v. *Erie R. R.*, 175 U. S., 348 (20 Sup. Ct., 136; 44 L. Ed., 192), is, we think, in point to uphold the constitutionality of the act under consideration. While the court does not use the language that, considering the Indiana act as applying only to railroad corporations, it cannot be regarded in conflict with the fourteenth amendment, yet it is evident the court intended to convey the idea that it was not called upon to consider it, except so far as railroad corporations were concerned, and is not to be taken at all as an intimation that it would hold the act of Indiana unconstitutional as to other corporations. The only ground upon which counsel attacks the act of 1898 is that it does not extend its provisions to natural persons, and therefore it is class legislation; and the court, in its order remanding the case, seems to intimate that the fact that natural persons are not included in the act would render it unconstitutional, as it applies to all corporations and no natural persons. But on this point the case of *Tullis* v. *Erie R. R.*, 175 U. S., 348 (20 Sup. Ct., 136; 44 L. Ed., 192), it seems to me, is decisive. If the fact that the omission from the act of natural persons would render the act in conflict with the fourteenth amendment, then the court would have said that the act imposed liabilities and restrictions upon corporations operating railroads, but does not impose the same liabilities or restrictions upon natural persons operating railroads, and is therefore unconstitutional. If the addition of the words '' natural

persons" to the act of 1898 under consideration would make it consistent with the provisions of the fourteenth amendment, as the court would seem to think, and counsel for appellees undoubtedly think, then the omission of the words "natural persons" from the Indiana act construed in *Tullis* v. *Railroad, supra,* should certainly have rendered the Indiana act obnoxious to the fourteenth amendment; yet the supreme court of the United States did not so hold. It seems to me there is no escape from this argument.

It seems to be conceded that the code of 1892, § 3559, of which the act of 1898 is amendatory, is constitutional, because it applies to railroad corporations solely. Now it occurs to me that the act of 1898 is to be considered in connection with the code of 1892, of which it is an amendment; and, if the court will compare the two, it will find that the only amendment necessary is to insert after the word "railroad," in sec. 3559, the words "or any corporation," and you will have the act of 1898, so far as the case under consideration is concerned, and you will have, also, very nearly the same wording as the act construed in the case of *Tullis* v. *Erie R. R.,* 175 U. S., 348 (20 Sup. Ct., 136; 44 L. Ed., 192), except that the Indiana act says "railroad or other corporations," but the sense is the same. If the omission of the words "natural persons" from the Indiana act renders it unconstitutional, why did not the supreme court say so? If it is not class legislation to put restrictions upon corporations operating railroads, when the same restrictions are not put upon natural persons operating railroads, why is it class legislation to put restrictions upon other corporations in the matter of negligence of its fellow servants and knowledge of defective machinery, when natural persons are not named. The answer to the question determines, it seems to me, the constitutionality of the act of 1898. In the case of *Missouri R. R. Co.* v. *McKay,* 127 U. S., 210 (8 Sup. Ct., 1161; 32 L. Ed., 107), the court says it is a matter of legislative discretion to impose the

same liabilities on carriers by canal and stage coaches, and to persons and corporations using steam in manufactories. Now, in the case of *Tullis* v. *Erie R. R.*, 175 U. S., 348 (20 Sup. Ct., 136; 44 L. Ed., 192), the court says that an act which imposes certain liabilities on railroad corporations is not un-constitutional because the words "natural persons" are omitted. Suppose the Indiana act had included corporate common carriers by water and by stage coach, but had not used the words "natural persons;" would this omission have rendered the act unconstitutional?

Another reason why the omission from the act of 1898 of natural persons does not render the act in conflict with the fourteenth amendment is the vast difference between natural persons and corporate persons, which would render this classi-fication reasonable. The individual man is created by God Almighty, and the corporate man by legislative enactment. The latter frequently grows into a giant, fed upon the special privileges accorded him at his birth—a giant in comparison to which the giants slain by the valorous Jack are mere pigmies. The natural man is supposed to have, and usually has, a con-science, and in dealing with his fellowmen is actuated by moral motives; while the other is known as the "soulless man," and often "neither regards man nor fears God." The natural man is more easily amenable to the criminal laws of the land, and can be reached with greater ease and facility. The other, even if born in this state, often resides out of it—that is, those who are responsible for the conduct and management of the corporation—and cannot be reached in their persons by the majesty of the law. The corporation being also the creature of legislative enactment, the legislature can pass many laws and restrictions upon its management and control which it would not be proper to enact as to the conduct of individuals. This principle is recognized in the case of *Missouri R. R. Co.* v. *Mackey*, 127 U. S., 208 (8 Sup. Ct., 1162; 32 L. Ed., 107), when the court says: "It cannot be successfully contended

that the state may not prescribe the liabilities under which corporations created by its laws shall conduct their business in the future.'' Of course, it will depend in a great measure on the nature and character of the legislation, whether or not such a classification as corporations and individuals would be a reasonable classification. Of course, if the legislature should pass a law, for instance, that all corporations who were unsuccessful litigants in this court should pay to their opponents 25 per cent. damages on the amount involved, while individuals were to pay 10 per cent., or none at all, then it would clearly be an arbitrary classification. But when the legislation is based upon the dealing of the corporation, through its servants, with its employes, looking to their safety and welfare, corporations being creatures of the legislature, it is, I think, exceedingly proper that such restrictions should be placed on them as would tend to insure the safety and welfare of their employes.

Now, as to the other proposition, whether, if the act should be constitutional as to some corporations and unconstitutional as to others, can the court in each particular case say the act is constitutional as to this case, but is not constitutional as to the other cases—that this corporation is engaged in a business inherently dangerous to its employes, and is a proper subject of legislative control, and the other corporation is not engaged in such business, and should not have the restrictions placed upon it ? At the first thought I was impressed with the fact that it was absurd to make the constitutionality of the act to depend upon the evidence adduced in each particular case; but, after considering the matter, I have come to the conclusion that is what the court or legislature does when it says as it did in *Tullis* v. *Erie R. R.*, 175 U. S., 348 (20 Sup. Ct., 136; 44 L. Ed., 192), that the business was dangerous. The act simply says railroad corporations, and the court says that the legislature had the right to restrict such corporations in their dealings with their employes, because of the dangerous and

hazardous character of the employment and business in which such corporations are engaged. But how do you know that railroad corporations are engaged in a dangerous and hazardous business? You must know it either as a matter of general knowledge or from the testimony of witnesses in any particular case. If the court takes cognizance from general knowledge that a railroad is engaged in a dangerous and hazardous business to its employes, why can it not take notice from general knowledge that a corporation engaged in the manufacture of oil from cotton seed, or furniture from various woods is engaged in a hazardous business. If the court does not know this of its general knowledge, what is the objection to ascertaining it from the facts of each particular case as testified by its witnesses? It would be impossible for the legislature to have enumerated *eo nomine* each and every corporation to which it intended the act to apply. If it did not do this, then there were only two courses to pursue: To say all corporations using the dangerous agency of steam in operating its machinery. Then the court would have to take cognizance from general knowledge that any specific corporation, from its name or the character of its business, used steam in operating its machinery, or else would have to inform itself as to this from testimony of witnesses in any given case. If the legislature should pursue the only other course, to-wit: of saying any corporation, and the court should deem that there might be some corporations to which it would be unconstitutional to apply such an act, then what is the objection to determining, either from general knowledge or the specific testimony of witnesses, that such corporation falls within the terms of the act constitutionally or unconstitutionally, according to the fact whether or not it is engaged in a business hazardous and dangerous to its employes? If the court, however, is of the opinion that the act of 1898 should have used some distinguishing words, as " corporations engaged in manufacture and using steam as an agency in operating machinery," or, "corpora-

tions engaged in a dangerous and hazardous business to their employes,'' then I shall call attention of the court to the fact that the act of 1898, taken in connection with the code of 1892, of which it is amendatory, reads, ''employes of a railroad or any corporation,'' and must be construed to mean a railroad or any corporation *ejusdem generis*—that is, any corporation engaged in a dangerous and hazardous business to its employes— and you have, then, unquestionably the classification on the face of the act.

The importance of upholding the act under consideration doubtless has occurred to the court. I know of several suits pending, brought upon the faith of this legislation; one especially against a steamboat corporation for the gross negligence of a superior officer. This and similar acts have been in force since 1896, and have become part of the settled law of the land; and, unless the unconstitutionality of the act is very clear, the courts by well-established rules should not declare it unconstitutional, if the act can be upheld consistently with the constitutional requirements. In the case of *Minneapolis & St. Louis Co.* v. *Herrick*, 127 U. S., 210 (8 Sup. Ct., 1176; 32 L. Ed., 109), the supreme court of the United States upholds a similar statute as to railroads, and does so on the authority of the *Mackey case* in the same volume. This case was carried up from the supreme court of the state of Minnesota, and is reported in 16 N. W., 413 (31 Minn., 11; 47 Am. Rep., 771). In the opinion rendered in the Minnesota court the learned judge says: ''The defendant further contends that the statute of Iowa (which was under consideration) is a violation of the fourteenth amendment of the constitution of the United States, which declares that no state shall deny to any person within its jurisdiction the equal protection of its laws. The ground of this contention is that the law does not apply to all persons, but only to railroad companies, thus imposing upon them a liability not imposed upon others. The supreme court says that there is a great danger that this fourteenth amendment

81 Miss.—34

may be applied to cases for which it was not intended, and it doubted whether it was ever intended to apply to cases like the present; but, if it was, we find nothing in the statute repugnant to its provisions.   If a state, in view of the peculiar nature of the service upon railroads and the dangers incident to it, shall, as a matter of state policy, require these corporations, which are the creatures of its statutes, to assume the risk of injuries to their servants from the negligence of fellow-servants also in their employ, we think they have a right to do so.'' I have quoted thus extensively from this opinion because the very point was there raised that the restrictions placed upon railroad companies were not made to apply to individual persons, and the court held that the omission to include private persons did not render the act of Iowa in conflict with the fourteenth amendment, and gave as one, if not the chief, reason that these corporations were the creatures of the legislature, and, being the creatures of the legislature, it could impose restrictions upon them in their dealings with their employes, so as to insure the safety of the said employes.   In the case of *Missouri Pacific R. R. Co.* v. *Humes*, 115 U. S., 512 (6 Sup. Ct., 110; 29 L. Ed., 463), in the first two pages of the decision (pages 519, 520, 115 U. S., and page 112, 6 Sup. Ct.; 29 L. Ed., 463), makes almost similar observations as the Minnesota court as to the danger of carrying too far the provisions of the fourteenth amendment, and applying it to cases it was never intended for, and, because of the apparent or real hardship of the state legislation, that the supreme court should grant relief; but if the law of the state be within the legitimate sphere of legislative power, and its enforcement be attended by the observance of those rules prescribed by our system of jurisprudence for the security of private rights, such laws will not be invalidated as in conflict with the constitution of the United States.   The jurisdiction of the supreme court of the United States cannot be invoked, unless some right under the constitution and treaties of the United States be invaded.   The supreme

court of the United States is not a harbor where refuge can be had from an act of ill-advised or oppressive state legislation. Opposing counsel has not the temerity for one moment to contend that the appellee (defendant corporation) is not a proper subject for legislative enactment, such as was intended to be accomplished by the act of 1898; but he is greatly concerned about his brother commercial operations and sawmill incorporations, and the great injustice done them by not making the act apply to natural persons.

In conclusion, I wish to say that I truly believe that the constitutionality of the act under consideration can be successfully defended upon both sound and legal moral principles. The vast difference between the legal and political status of natural persons and corporate persons, and the great difference between the relation which the two bear to society, taken in connection with the fact that corporations are the creatures of the law, makes it perfectly competent for the legislature to impose restrictions of the character contained in the act of 1898 on corporations without imposing the same restrictions and liabilities upon natural persons, and by so doing such legislation is not rendered inimical to any provision of either the state or the United States constitution.

*Smith, Hirsh & Landau,* for appellee.

The court at the spring term again remanded this cause to the docket for reargument on this proposition: "There are some classes of corporations, as railroads, as to which it is clearly constitutional. May there not be some as to which it would be unconstitutional—the statute embracing all corporations and no natural persons? Must not the distinction be based on some difference inhering in the very nature of the business, as, for instance, the dangerous character of steam as an agency in railroads? Now, since the statute on its face is general, applying, without reference to the inherent nature of the business, to all corporations, can the statute be separated

and severed so as to be constitutional as to some and unconstitutional as to others, as in *Tullis* v. *Erie R. R.*, 175 U. S., 348 (20 Sup. Ct., 136; 44 L. Ed., 192), and *Pittsburg* v. *Montgomery*, 152 Ind., 15 (49 N. E., 592; 71 Am. St. Rep., 301)? Must not the boundaries by which the severance is made appear on the face of the statute? When 'railroad or other corporations' are named the word 'railroad' furnishes the boundaries or means of severance. They appear on the face of the statute. But in a statute like this, not itself furnishing any means of severance on its face, can the court determine, by looking into the evidence in each case, that one corporation falls within the statute constitutionally and another does not? Determine it by whether the evidence shows the nature of the business is in one case inherently dangerous, and in another not? Would this not be judicial legislation? Or, to put it differently, when the act on its face by its terms may apply to all corporations, can it be severed, on the idea that the court can look to the evidence in each case, and, so looking, say that one is within, and the other without, the statute; the court severing, not by the terms used in the statute, but by the proof? Consult note to *St. L. R. Co. y. Paul*, 62 Am. St. Rep., at page 181, top." We note that the directions of the honorable court really subdivide the question for argument into three different propositions, and we shall therefore so divide and discuss them.

(1) "There are some classes of corporations, as railroads, as to which it is clearly constitutional. May there not be some as to which it would be unconstitutional; the statute embracing all corporations, and no natural persons? Must not the distinction be based on some difference inhering in the very nature of the business, as, for instance, the dangerous character of steam as an agency in railroads?" As to the two questions propounded in this proposition, we submit unhesitatingly that the overwhelming weight of authority shows that these questions must be answered in the affirmative.

In the leading case of *Missouri Pac. R. Co.* v. *Mackey*, 127 U. S., 205 (8 Sup. Ct., 1161; 32 L. Ed., 107), the supreme court of the United States uses this language: "But the hazardous character of the business of operating a railway would seem to call for special legislation, with respect to railroad corporations, having for its object the protection of its employes, as well as the safety of the public. The business of other corporations is not subject to similar dangers to their employes, and no objections, therefore, can be made to the legislation on the ground of its making an unjust discrimination."

In the case of *Akeson* v. *C., B. & Q. R. Co.*, 106 Iowa, 54 (75 N. W., 676), the supreme court of Iowa, in discussing a statute somewhat similar, uses this language: "The peculiarity of the railroad business, which distinguishes it from any other, is the movement of vehicles or machinery of great weight on the track by steam or other power, and the dangers incident to such movement are those the statute was intended to guard against." If employes, in discharge of their duties, are submitted to special perils and hardships, legislation having for its object its diminution is defensible. Hence a street railway corporation may be compelled to provide screens in front of motormen in charge of electric cars to protect them from wind and rain. *State* v. *Nelson*, 52 Ohio St., 88 (39 N. E., 22; 26 L. R. A., 317); note to *St. L., I. M. & S. R. Co.* v. *Paul*, 62 Am. St. Rep., 176.

In the case of *Holden* v. *Hardy*, 169 U. S., 393 (18 Sup. Ct., 388; 42 L. Ed., 780), the court uses the following language: "While the business of mining coal and manufacturing iron began in Pennsylvania as early as 1716, and in Virginia, North Carolina, and Massachusetts even earlier than this, both mining and manufacturing were carried on in such a limited way and by such primitive methods, that no special laws were considered necessary, prior to the adoption of the constitution; for the protection of the operatives; but, in the vast proportion which these industries have since assumed, it has been

found that they can no longer be carried on with disregard to the safety and health of those engaged in them, without special protection against the dangers necessarily incident to these employments. In consequence of this, laws have been enacted in most of the states, designed to meet these exigencies and to secure the safety of persons peculiarly exposed to these dangers. Within this general category are ordinances providing for fire escapes for hotels, theaters, factories, and other large buildings, and a municipal inspection of boilers and appliances designed to secure passengers on railways and steamboats against the dangers necessarily incident to these methods of transportation. In states where manufacturing is carried on to a large extent, provision is made for the protection of dangerous machinery against accidental contact, for the cleanliness and ventilation of working rooms, for the guarding of well holes, stairways, and elevator shafts, and for the employment of sanitary appliances. In others, where mining is the principal industry, special provision is made for the shoring up of dangerous walls, for ventilation shafts, bore holes, escapement shafts, means of signaling the surface for the supply of fresh air, and the elimination, as far as possible, of the dangerous gases, for safe means of hoisting and lowering cages, for a limitation upon the number of persons allowed to enter a cage, that cages shall be covered, and that there shall be fences and gates around the top of shafts besides other similar precautions. These statutes have been repeatedly enforced by the courts of the several states, their validity assumed, and, so far as we are informed, they have been uniformly held to be constitutional."

In the case of *Cotting* v. *Kansas Stockyards Co.*, 183 U. S., 79 (22 Sup. Ct., 30; 46 L. Ed., 92), will be found a full and elaborate discussion of the doctrine of equality before the law, and of the effect of the fourteenth amendment to the constitution of the United States. The court had under consideration an act of the legislature of the state of Kansas, passed in 1897,

designed to regulate charges of stockyards. It expressly lim-
ited the operation of the act to those stockyards which, for the
preceding twelve months should have had an average daily re-
ceipt of not less than 100 head of cattle, or 300 head of hogs,
or 300 head of sheep, and these were declared to be public
stockyards, and a certain schedule of charges were fixed for
such stockyards. On page 112, 183 U. S., and page 30, 22
Sup. Ct., 46 L. Ed., 92, the court in that case uses this lan--
guage: "This statute is not simply legislation which in its
indirect results affects different individuals or corporations
differently, nor with those in which a classification is based
upon inherent differences in the character of the business, but
is a positive and direct discrimination between persons engaged
in the same class of business, and based simply upon the quan-
tity of business which each may do." We say that the act of
the legislature of the state of Mississippi is not based upon
any inherent difference in the character of the business, but is
based solely upon the fact that the proprietors of the business
have seen fit to incorporate this business, as a matter of busi-
ness precaution and prudence, rather than conduct it in their
individual names. The court in the *Cotting case* were unani-
mous in reversing the judgment of the supreme court of the
state of Kansas, on the ground that the statute of Kansas was
in violation of the fourteenth amendment to the constitution of
the United States.

In the case of *Soon Hing* v. *Crowley*, 113 U. S., 709 (5
Sup. Ct., 730; 28 L. Ed., 1145), the supreme court of the
United States defined as accurately as can be defined what are
unjust discriminations, measured by the standard of the four-
teenth amendment. This definition is as follows: "The dis-
criminations which are open to objection are those where
persons engaged in the same business are subject to different
restrictions, or are held entitled to different privileges under
the same conditions. It is only then that the discrimination
can be said to impair that equal right which all can claim in

the enforcement of the law." Judged by this statement, what reasonable ground can the restrictions of the act of 1898 be placed on ? Why should three gentlemen, or more, who desire to incorporate their business, be subject to different liabilities, different restrictions, from what they would be held to if they conducted their business in their individual names and as a partnership ?

(2) "Now, since the statute on its face is general, applying, without reference to the inherent nature of the business, to all corporations, can the statute be separated and severed, so as to be constitutional as to some and unconstitutional as to others, as in *Tullis* v. *Erie R. R.*, 175 U. S., 348 (20 Sup. Ct., 136; 44 L. Ed., 192), and *Pittsburg C. C. & St. L. R. Co.* v. *Montgomery*, 152 Ind., 15 (49 N. E., 582; 71 Am. St. Rep., 301) ? Must not the boundaries by which the severance is made appear on the face of the statute?" We answer with equal confidence the second interrogation propounded by the court in the affirmative.

The act of 1898 is, as the court well says, general in its terms. Prior to the passage of the act of 1898, the common law, except as altered by sec. 193 of the constitution of Mississippi and § 3559 of the annotated code, was in force in Mississippi, and governed the liability of employes of every kind and nature, whether they were corporations or individuals. These sections of the constitution and the code do not purport to change the common law in any particular, except as to employes of railroad corporations. Acts 1898, ch. 66, reads, word for word, so far as concerns imposing liability upon corporations for injuries to employes, the same as sec. 193 of the constitution and § 3559 of the code, with two exceptions. By these exceptions the word "railroad" is stricken out before the word "corporations," and further along the words "or the improper loading of cars" are inserted. We mean by this that so much of the act of 1898 as imposes the liability upon the employer when it is a corporation is word

for word sec. 193 of the constitution and § 3559 of the code. It is manifest, therefore, that the legislature had in its mind and intended not to classify corporations upon any reasonable basis, but simply to group them as a whole, and, because they were corporations, to impose these liabilities and restrictions upon them. The act of 1898, does not, therefore, admit of any separation. The legislature did. not separate. The legislature did not give boundaries. If it had started out with one section applying to railroads, then another section applying to corporations which are operated by the dangerous agencies of steam or electricity, or another section applying to manufacturing corporations, requiring them to protect their shafting by cover, and requiring them to use set-screws which were sunken, or otherwise protect employes of such corporations from danger of having their clothes caught by the said set-screws, and having another section apply to corporations of certain magnitude, and which, therefore, had a great number of employes, and these employes were, therefore, subjected to the increased danger and hazard from the negligence of co-employes, the court could simply uphold the first three sections of such an act as constitutional, and under the authority of the *Cotting case, supra,* the fourth section could be held unconstitutional, because it would be plain and manifest to the court that the legislature had in mind to legislate in behalf of the employes named in the first three sections, and also in the fourth section, and no others. The legislature having in mind the employes named in the first three sections, it would be manifest to the court that the legislature intended to protect them at all hazards, and not to mingle their right with those of other employes, so that they could not be separated; but in this case the court could not possibly reach such a conclusion, because it is manifest from the words of the statute that the legislature had in mind employes of all corporations, and not employes of any particular corporations. The legislature had

in mind to accomplish a single object, to wit, the protection of employes of all corporations, and no other object.

The rule governing courts in declaring part of a statute unconstitutional and upholding another part is well defined in Cooley's Const. Limit. (5 ed.), marg. p. 178: "If, when the unconstitutional portion is stricken out, that which remains is complete in itself, and capable of being executed in accordance with the apparent legislative intent, wholly independent of that which was rejected, it must be sustained. The difficulty is in determining whether the good and bad parts of a statute are capable of being separated within the meaning of this rule. If a statute attempts to accomplish two or more objects and is void as to one it may still be in every respect complete and valid as to the other; but if its purpose is to accomplish a single object only, and some of its provisions are void, the whole must fail, unless sufficient remains to effect the object without the aid of the invalid portion, and if they are so mutually connected with and dependent on each other, as conditions, considerations, or compensations for each other, as to warrant the belief that the legislature intended them as a whole, and if all could not be carried into effect, the legislature would not pass the residue independently, then, if some parts are unconstitutional, all of the provisions which are thus dependent, conditional or connected must fall with them." In case of *Commonwealth* v. *Hitchings*, 5 Gray, 485, this language is used: "It is also well settled that when part of a statute is unconstitutional that will not authorize the court to declare the remainder of the statute void, unless all of the provisions are connected in subject-matter, depending on each other, operating together for the same purpose, or otherwise so connected in meaning that it cannot be presumed that the legislature would have passed one without the other." We defy the most careful scrutiny and the most microscopic investigation of ch. 66, p. 85, of the act of 1891, to show that the legislature of Mississippi had any other purpose or design than to embrace

all corporations.   No particular class or classes of corporations can, by the most violent presumption, be held to have been intended by the legislature to have been included in the act and all others to be exempted from its operations.

(3) When "railroad and other corporations" are named the word "railroad" furnishes the boundaries or means of severance.   They appear on the face of the statute.   But in a statute like this, not itself furnishing any means of severance on its face, can the court determine, by looking into the evidence in each case, that one corporation falls within the statute constitutionally, and another does not?   Determine it by whether the evidence shows the nature of the business is in one case inherently dangerous, and in another not?   Would not this be judicial legislation?   Or, to put it differently, when the act on its face by its terms may apply to all corporations, can it be severed, on the idea that the court can look into the evidence in each case, and, so looking, say that one is within, and the other without, the statute; the court severing, not by the terms used in the statute, but by the proof?

Our theory of constitutional government is that the people have delegated all governmental powers to three separate branches—executive, legislative, and judicial.   It is the duty of the executive department to see that the laws are enforced. It is the duty of the legislative department to enact the laws. It is the duty of the judicial department to expound the law, or, in other words, to declare what the law is.   Each one of these three departments must confine itself within its own domain, and not trespass upon the domain of any other.   Experience has shown the wisdom of this plan, and, whenever one department has trespassed on the domain of the other, the rights and liberties of the people have suffered.   History shows that in the time of greatest passion, when reason has wellnigh lost its sway, the calm dispassionate judgment of the courts has preserved intact this distinction and the liberties of the people.   In the case of *United States* v. *Reese*, 92 U. S.,

214 (23 L. Ed., 563), the supreme court of the United States, at a time when the people of the South were despairing of the republic, unmoved by passion, held unerringly to the line laid out by the fathers. We quote from the language of Chief Justice Waite in this case : "We are therefore directly called upon to decide upon whether a penal statute enacted by congress, with its limited powers, which is in general language broad enough to cover wrongful acts without, as well as within, the constitutional jurisdiction, can be limited by judicial construction, so as to make it operate on that which congress may rightfully prohibit and punish. For this purpose we must take these sections of the statute as they are. We are not able to reject a part which is unconstitutional, and retain the remainder, because it is not possible to separate that which is unconstitutional, if there be any such, from that which is not. The proposed effect is not to be attained by striking out or disregarding words that are in the section, but by inserting those that are not now there. Each of the sections must stand as a whole, or fall together. The language is plain. There is no room for construction, unless it be as to the effect of the constitution. The question, then, to be determined, is whether we can introduce words of limitation into a penal statute, so as to make it specific, when, as expressed, it is general, only. It would certainly be dangerous if the legislature could set a net large enough to catch all possible offenders, and leave it to the courts to step inside and say who could be rightfully detained, and who shall be set at large. This would, to some extent, substitute the judicial for the legislative department of the government. The courts enforce the legislative will when ascertained, if within the constitutional grant of power. Within its legitimate. sphere, congress is supreme, and beyond control of the courts; but if it steps outside of its constitutional limitations, and attemps that which is beyond its reach, the courts are. authorized to, and when called upon in due course of legal proceeding must annul its

encroachments upon the reserved power of the state and the people. To limit this statute in the manner now asked for would be to make a new law, not to enforce an old one. This is no part of our duty."

The same rules govern the interpretation of the statutes which govern the interpretation of contracts or other written instruments. The rule is well expressed in Cooley on Const. Lim., p. 68: "Where a law is plain and unambiguous, whether it be expressed in general or limited terms, the legislature should be intended to mean what they have plainly expressed, and consequently no room is left for construction. Possible, or even probable, meaning, when one is plainly declared in the instrument itself, the courts are not at liberty to search for elsewhere. Whether we are considering an agreement between parties, a statute, or constitution, with a view to its interpretation, the thing which we are to seek is the thought which it expresses." Applying this plain and cardinal principle to the interpretation of this statute, we fail to see that there is power or authority in this honorable court to look beyond the words of the act, which apply to all corporations, and at the evidence in each case, and decide that one corporation is within, and the other without, the statute. This would be for the court to say, not that the employes of any corporations are entitled to the benefits of this act, as the legislature has said, but that employes of those corporations whose employment subjects them to unusual dangers and hazards were only intended by the legislature to be embraced within the provisions of this act. This would be the plainest and most manifest judicial legislation. The court would thereby decide that, when the legislature used the words "any corporation," it did not mean any corporation, but only meant some corporations.

In the opinion in the case of *Atchison, Topeka & Santa Fe Railroad Co.* v. *Matthews*, 58 Kan., 447 (49 Pac., 602), the court used this language: "Our statute is somewhat in the

nature of a police regulation, designed to enforce care on the part of the railroad companies to prevent the communication of fire and the destruction of property along railroad lines. It is not intended merely to impose a burden on railroad corporations that private persons are not required to bear, and the remedy offered is one the legislature has the right to give in such cases. This is the view heretofore held by this court, which we see no reason for changing.'' In the case of *Missouri Pacific Ry. Co.* v. *Merrill*, 40 Kan., 404 (19 Pac., 793), it was said: '' The objection that this legislation is special and unequal cannot be sustained. The dangerous element employed and the hazard to persons and property arising from the running of trains and the operation of railroads justified such a law; and the fact that all persons and corporations brought under its influence are subjected to the same duties and liabilities under similar circumstances disposes of the objections raised.''

Chapter 66, acts 1898, is unconstitutional. But conceding, for the sake of argument,. that all we have heretofore contended for can be successfully controverted, then we say that the action of the court was correct in excluding the evidence of plaintiff from the jury, because this action is based upon acts 1898, p. 85, ch. 66. If this act had not been passed undoubtedly the action of the court would have been correct, because the law as it stood at that time would have warranted the action of the court in excluding the testimony. Prior to the adoption of this act the law was too plain that the deceased was guilty of contributory negligence for us to cite authorities. We contend that this act is unconstitutional because it is violative of the fourteenth amendment to the constitution of the United States. The record shows that the defendant was chartered as a corporation on February 18, 1902. The act of the legislature (ch. 66) was passed in January, 1898, and singles out and confers certain rights of action in favor of employes of corporations, and imposes liabilities upon corporations in cer-

tain states of case therein stated, but does not impose the same liabilities upon natural persons. In other words, it arbitrarily singles out corporations and puts them upon another and a differ-- ent footing from that of natural persons. We contend that this· is violative of the fourteenth amendment to the constitution of. the United States. We contend that this is a denial to corpo- rations within the jurisdiction of the state of Mississippi of the equal protection of the laws. That corporations are persons within the meaning of the fourteenth amendment has been repeatedly held by the supreme court of the United States. This question came first before the supreme court in the case of *Santa Clara R. R. Co.* v. *So. Pac. Ry.*, 118 U. S., 394; (6 Sup. Ct., 1132; 30 L. Ed., 118). Before argument of that. case, Chief Justice Waite interrupted the counsel and said: "The court does not wish to hear argument on the question whether the provision in the fourteenth amendment to the con- stitution, which forbids a state to deny to any person within its jurisdiction the equal protection of the laws, applies to these corporations. We are all of the opinion that it does." In the case of *Gulf, C. & S. F. R. R.* v. *Ellis*, 165 U. S., 154 (17 Sup. Ct., 255; 41 L. Ed., 666), the supreme court of the United States uses this language: "It is well settled that cor- porations are persons within the provision of the fourteenth amendment to the constitution of the United States." The case cites numerous decisions of the supreme court. The rule which we deduce from the different decisions of the supreme court of the United States construing the fourteenth amend- ment is this: That the legislature of a state can make a reason- able classification of persons, and impose certain liabilities upon persons within this classification, but it cannot arbitrarily single out a certain class of persons or corporations and impose liability upon them.

In the case of *Gulf, C. & S. F. R. R.* v. *Ellis*, 165 U. S., 150 (17 Sup. Ct., 255; 41 L. Ed., 666), the legislature of the state of Texas passed an act which provided that "no person

in this state having a valid *bona fide* claim for personal services rendered, or labor done, or for damages, or for overcharges on freight or claims for stock killed or injured by the train of any railroad company, provided that such claim for stock killed or injured shall be presented to the agent of the company nearest to the point where the stock was killed or injured against any railway corporation operating a railroad in this state, and the amount of .such claim does not exceed $50, may present the same, verified by his affidavit, for payment to such corporation by filing it with any station agent of such corporation in any county where suit may be instituted for the same, and if at the expiration of thirty days after such presentatio n such claim has not been paid or satisfied he may immediately institute suit thereon in the proper court, and if he shall finally establish his claim and obtain judgment for the full amount thereof as presented for payment to such corporation in such court or any court to which suit may have been appealed, he shall be entitled to recover the amount of such claim and all costs of suit, and in addition thereto all reasonable attorney's fees, provided he has an attorney employed in his case, not to exceed $10, to be assessed or awarded by the court or jury trying the issue." It was held " that this act operated to deprive railroad companies of property without due process of the law, and to deny to them the equal protection of the law, in that it singles them out of all citizens and corporations, and requires them to pay in a certain case attorney's fees to the parties successfully suing them, while it gives to them no like or corresponding benefit." It was further held in this case " that the mere fact of classification is not sufficient to relieve a statute from the reach of the equality clause of the fourteenth amendment, and in all cases it must appear, not merely that the classification has been made, but also that it is based upon some reasonable ground, something which bears a just and proper relation to the attempted classification and is not a mere arbitrary selection." It was also held " that,

tested by these principles, the statute in controversy could not be sustained.''

In *Barbier* v. *Connolly*, 113 U. S., 27 (5 Sup. Ct., 357; 28 L. Ed., 923), the court had under consideration an ordinance of the board of supervisors of the city and county of San Francisco, Cal., regulating public laundries. This ordinance provided certain inspections by the public health officer for the ascertainment of the drainage of the premises, and whether or not the stoves, washing and drying apparatus, and appliances for heating smoothing irons, were in good condition, and that their use was not dangerous to the surrounding property from fire, etc. The fourth section of the ordinance declared that ''no person owning or employed in a public laundry or public wash-house within the prescribed limits shall wash or iron clothes between the hours of ten in the evening and six in the morning, or upon any portion of Sunday.'' It was contended that the fourth section was in violation of the fourteenth amendment. In holding that it was not so, Judge Field, who delivered the opinion of the court, uses this language: ''There is no invidious discrimination against anyone within the prescribed limits by such regulations. There is none in the regulation under consideration. The specification of the limits within which the business cannot be carried on without the service of the health ordinance and board of fire ordinance is merely a discrimination of the portion of the city in which the precautionary measures against fire and to secure proper drainage must be taken for the proper health and safety. It is not legislative discrimination against anyone. All persons engaged in the same business within it are treated alike, are subject to the same restrictions, and are entitled to the same privileges under similar conditions. The fourteenth amendment, in declaring that no state shall deprive any person of life, liberty, or property without due process of law, nor deny to any person within its jurisdiction the equal protection of the laws, undoubtedly intended not only that there should be no arbitrary

deprivation of life or liberty, or arbitrary spoliation of property, but that equal protection and security should be given to all under like circumstances in the enjoyment of their personal and civil rights; that all persons should be entitled to pursue their happiness and acquire and enjoy property ; that they should have like access to the courts of the country for the protection of their persons and property, the prevention and redress of wrongs, and the enforcement of contracts ; that no impediment should be interposed to the pursuits of any one, except as applied to the same pursuits by others under like circumstances ; that no greater burden should be laid upon one than are laid upon others in the same calling and condition ; and that in the administration of criminal justice no different or higher punishment should be imposed upon one than such is prescribed to all for like offences.'' Further along the court says: ''Class legislation, discriminating against some and favoring others, is prohibited, but legislation which, in carrying out a public purpose, is limited in its application, if within the sphere of its operation it affects alike all persons similarly situated, is not within the amendment.''

In the case of *Soon Hing* v. *Crowley*, 113 U. S., 703 (5 Sup. Ct., 730; 28 L. Ed., 1145), the same doctrine is enunciated by the supreme court, citing the case of *Barbier* v. *Connolly*, and having under consideration the same ordinance. The syllabus of this case uses this language: ''Municipal restrictions imposed upon one class of persons engaged in a particular business, which are not imposed upon others engaged in the same business and under like conditions, impair the equal rights which all can claim in the enforcement of the laws.'' In the opinion in this case, on pp. 708, 709, 113 U. S., and p. 733, 5 Sup. Ct. (28 L. Ed., 1145), the court uses this language : ''There is no force in the objection that an unwarrantable discrimination is made against persons engaged in the laundry business, because persons engaged in other kinds of business are not required to cease from their labors

during the same hours at night.    There may be no risks attend-
ing the business of others, certainly not as great as where fires
are constantly required to carry them on.    The specific regula-
tions for one kind of business, which may be necessary for the
protection of the public, can never be a just ground of com-
plaint, because like restrictions are not imposed upon other
business of a different kind.    The discriminations which are
open to objection are those where persons engaged in the same
business are subject to different restrictions, or are held enti-
tled to different privileges under the same conditions.    It is
only then that the discrimination can be said to impair that
equal right which all can claim in the enforcement of the laws.''

In *Gulf, C. & S. F. R. Co.* v. *Ellis*, 165 U. S., 155 (17
Sup. Ct., 255; 41 L. Ed., 666), this idea is further elaborated;
the court using this language: '' But it is said that it is not
within the scope of the fourteenth amendment to withhold
from the states the power of classification, and that, if the law
deals alike with all of a certain class, it is not obnoxious to the
charge of the denial of equal protection.    While, as a general
proposition, this is undeniably true, yet it is equally true that
such classification cannot be made arbitrary.    A state may not
say that all white men shall be subjected to the payment of an
attorney's fee of parties successfully suing them, and all black
men not.    It may not say that all men beyond certain age
shall alone be thus subjected, or all men possessed of a certain
wealth.    These are distinctions which do not furnish any
proper basis for the attempted classification.    That must al-
ways rest upon some difference which bears a reasonable and
just relation to the act in respect to which the classification is
proposed, and can never be made arbitrary and establish any
such basis.''

In the case of *Gulf, C. & S. F. R. Co.* v. *Ellis*, 165 U. S.,
155 (17 Sup. Ct., 255; 41 L. Ed., 666), the supreme court of
the United States quotes with marked approval a case in the
supreme court of Missouri—*State* v. *Loomis*, 115 Mo., 307

(22 S. W., 350; 21 L. R. A., 789).   The statute of Missouri
under consideration by the court in the case mentioned was
secs. 7058–7060 of the revised statutes of the state of Mis-·
souri of 1889, making it unlawful for any corporation, person,
or firm engaged in manufacturing or mining to use for the
payment of wages any order, check, or other token of indebt-
edness, payable otherwise than in lawful money, unless the
same is negotiable and redeemable in cash at its face value, or
in cash, at the option of the holder, at the store or other place
of business of the corporation, person, or firm, without plac-
ing similar restrictions on other persons employing labor; and
it was held to be unconstitutional for that reason.   Chief Jus-
tice Black uses this language in that case: " Classifications for
legislative purposes must have some reasonable basis upon
which to stand.   It must be evident that differences which
would serve for a classification for some purposes furnish no
reason whatever for a classification for legislative purposes.
The difference which will support class legislation must be such
as in the nature of things furnishes a reasonable basis for sep-
arate laws and regulations.   Thus the legislature may fix the
age at which persons shall be deemed competent to contract for
themselves, but no one will claim that competency to contract
can be made to depend upon stature or color of the hair.   Such
classification for such purpose would be arbitrary and a piece
of legislative despotism, and therefore not the law of the land."
Further along in the same case the supreme court of Missouri
uses this language:. " There can be no doubt but that the legis-
lature may regulate the business of mining and manufacturing,
so as to secure the health and safety of the employes; but
that is not the scope of the two sections of the statute now in
question.   They single out these persons who are engaged in
carrying on the pursuits of mining and manufacturing, and
say to such persons: 'You cannot contract˙for labor payable
alone in goods, wares, or merchandise.   The farmer, the mer-
chants, the builders, and the numerous contractors employing

thousands of men, may make such contracts; but you cannot.' They say to the mining and manufacturing employes: 'Though of full age and competent to contract, still you shall not have the power to sell your labor for meat and clothing alone, as others may.' It will not do to say that these sections simply regulate payment of wages, for that is not their purpose. They undertake to deny to the persons engaged in two designated pursuits the right to make and enforce the most ordinary every-day contracts—the right accorded to all other persons. This denial of the right to contract is based upon a classification which is purely arbitrary, because the ground of the classification has no relation whatever to the natural capacity of persons to contract. Now, it may be that instances of oppression have occurred and will occur on the part of some mine owners and manufacturers; but do they not occur quite as frequently in other fields of labor ? Conceding that such instances may and do occur, still they furnish no reasonable basis for depriving all persons engaged in the two lawful and necessary pursuits of the right to make and enforce every day contracts. Liberty, as we have seen, includes the right to contract as others may; and to take that right away from a class of persons following lawful pursuits is simply depriving such persons of a time-honored right which the constitution undertakes to secure to every citizen. Applying the principle of constitutional law before stated, we can come to no other conclusion than that these sections of the statute are utterly void. They attempt to strike down one of the fundamental principles of constitutional government. If they can stand, it is difficult to see an end to such legislation, and the government becomes one of special privileges, instead of one to promote the general welfare of the people. We place our conclusion on the broad ground that these sections of the statute are not due process of law, within the meaning of the constitution."

Judge Cooley, in his work on Const. Lim. (6th ed., p. 484), uses this language : "The doubt might also arise whether a

regulation made for any one class of citizens, entirely arbitrary in its character, and restricting their rights, privileges, or legal capacity in a manner before unknown to the law, could be sustained, notwithstanding its generality. Distinctions in these respects must rest upon some reason upon which they can be defended, like the want of capacity in infants and insane persons; and if the legislature should undertake to provide that persons following the same specified lawful trade or employment should not have capacity to make contracts or to build such houses as others were allowed to erect, or in any way to make such use of their property as was permissible to others, it can scarcely be doubted that the act would transcend the due bounds of legislative power, even though no express constitutional provision could be pointed out with which it would come in conflict. To forbid an individual or a class the right to the acquisition and enjoyment of property in such manner as should be permitted to the community at large would be to deprive them of liberty in particulars of primary importance to their pursuit of happiness; and those who shall claim the right to do so ought to be able to show specific authority therefor, instead of calling upon others to show how and where the authority is negatived."

In the case of *Vanzant* v. *Waddel*, 2 Yerg., 260, the supreme court of Tennessee used this language: "Every partial or private law which directly proposes to destroy or affect individual rights, or does the same thing by affording remedies leading to similar consequences, is unconstitutional and void. Were this otherwise, individuals and corporate bodies would be governed by one rule, and the mass of the community who made the law by another."

In the case of *Ragio* v. *State*, 86 Tenn., 272 (6 S. W., 401), an act of the legislature of the state of Tennessee made it a misdemeanor for any one engaged in the business of a barber to keep open bathrooms on Sunday. It was held that the act was unconstitutional. There was no reason why barbers should

be prevented from keeping bathrooms open on Sunday that were not equally applicable to innkeepers, and to all other persons who kept and used bathrooms for profit.

In the case of *Dibrell* v. *Morris' Heirs*, a decision of the supreme court of Tennessee, rendered January 13, 1891, reported in 15 S. W., 87, an act of the legislature of the state of Tennessee was passed which provided that, where a lunatic or *non compos mentis* dies intestate and possessed of personalty derived from an intestate spouse, such property should pass to the next of kin of the person from whom it was derived. It was held that this act deprived the widow of the right to transmit by inheritance any property derived from her deceased husband, and it deprived her of property within the meaning of the constitution of the state of Tennessee. The opinion in this case is a very learned and exhaustive one, reviewing at large the decisions of different courts, and uses this language: "We conclude, upon a review of the cases referred to above, that whether the statute be public or private, and general or special in form, if it attempts to create distinctions and classifications between the citizens of this state, the basis of such classification must be natural, and not arbitrary. If the classification is made for the purpose of conferring upon the class the benefit of some special right, privilege, immunity, or exemption, there must be some good and valid reason why that particular class should be the recipient of the benefit. If the classification is made for the purpose of subjecting the class to the burden of some special disability, duty, or obligation, there must be some good and valid reason why that particular class should alone be subject to the burden." Further along in the opinion, and as showing why the statute under consideration was unconstitutional, the court says: "There is no reason why lunatics should be deprived of the right to transmit their property by inheritance to their heirs or next of kin that do not apply equally to persons who are sane. We think that the classification made by the act of 1885 is unnatural, arbitrary,

and capricious, and for that reason we hold it to be unconstitutional.''

The last utterance of the supreme court that we have found on this subject is in *Tullis* v. *Lake Erie & Western R. R. Co.*, 175 U. S., 348 (20 Sup. Ct., 136; 44 L. Ed., 192), construing a statute of Indiana approved March 4, 1903. Section 1 of this statute provides ''that every railroad or other corporation, except municipal,'' etc. This statute was upheld in a case against a railroad, for the obvious reason that the supreme court had, prior to that time, held that to impose such liabilities upon railroads was not unconstitutional, owing to the hazardous character of the business of operating a railroad (see *Missouri Pac. R. R.* v. *Mackey*, 127 U. S., 205; 8 Sup. Ct., 1161; 32 L. Ed., 107), and because it was perfectly permissible, under the familiar rule of construction, to uphold that part or so much of that statute. The rule is too familiar to need quotations that, where a part of a statute can be maintained, it is the duty of the court to maintain it. Chapter 66, p. 85, of the laws of Mississippi of 1898, does not, however, do this. It puts all corporations in one class. It does not use the language of the Indiana statute, to-wit, ''that any railroad or other corporation,'' but uses the following language: ''Every employe of any corporation,'' etc. Further along it uses this language: ''Knowledge by an employe injured of the defective or unsafe character or condition of any machinery, ways or appliances, or the improper loading of cars, shall not be a defense to an action for injury caused thereby.''

In this connection we would call the attention of the court to ch. 65, p. 82, of the acts of 1898, as further emphasizing the argument that ch. 66 is an arbitrary classification. Chapter 65 consolidates the rights of action by § 663 of the annotated code of 1892, and further enlarges the rights of action conferred by § 663, by giving a right of action, by sec. 2, where the injury resulted in death. This chapter uses this language: '' Whenever the death of any person shall be caused by any

real, wrongful or negligent act, or omission, or by such un-
safe machinery, ways or appliances, as would, if death had not
ensued, have entitled the party injured or damaged thereby to
maintain an action and recover damages in respect thereof, and
such deceased person shall have left a widow or children or
both, or husband, or father, or mother, or sister, or brother,
the person or corporation,'' etc.   Chapter 66, as we have said
before, singles out corporations, arbitrarily classifies them, and
leaves every natural person doing the same business as a cor-
poration free from the liability imposed by ch. 66.   It does
not say that any corporation employing the dangerous agency
of steam, or any corporation employing the dangerous agency
of electricity, or any railroad corporation, nor does it say that
any employe or any person or corporation shall have the rights,
remedies, etc., but arbitrarily selects corporations.   To show
how arbitrarily this ch. 66 operates, we will give illustrations:

Suppose that the incorporators of the Mississippi Cotton Oil
Company had not elected to become chartered or incorporated,
but had been, at the time of the accident to John Ballard, de-
ceased, conducting their oil mill business at Yazoo City under
the name of R. W. Millsaps & Co.   Then they would not have
been liable, and ch. 66, p. 85, of the acts of 1898 would not
have applied.

Suppose a planter in the Delta has so large an amount of
land in cultivation that, in recognition of the vicissitudes of
cotton planting, he should prefer to incorporate that part of
his business, and not subject himself and his estate to personal
liability for the debt of his planting business.   Suppose he
were to take out a charter, and call it the Bolivar County
Planting Company.   We will suppose, by way of further
illustrating, that alongside of the property of the Bolivar
County Planting Company is a planter of equal magnitude,
who has not elected to take this course.   We will suppose,
then, by way of further illustration, that the gin plants on

these two plantations are out of repair, but known to the employe or employes of both to be out of repair, and, notwithstanding that, the employes of both of these parties proceed to gin the crop.  Suppose, then, that on the same day and at the same hour one or more of these employes of both of these parties are injured in identically the same way.  The result of the accident would be, if ch. 66 of the acts of 1898 is constitutional, that the Bolivar County Planting Company would have a liability imposed upon it, but the individual would go free, because his employes had knowledge of this defective machinery and continued to use it.

Let us again, by way of illustration, take another large industry in this state, to-wit, sawmilling.  Suppose one man has an independent fortune, and has a large body of pine lands, say in Clarke county, Mississippi, and, being desirous of converting the timber upon these lands into lumber, and recognizing that the sawmill business is hazardous, and likely to impose large liability upon him, he incorporates this business under the name of the Clarke County Sawmilling Company.  Alongside of him and his property in Clarke county is an individual owning an equal body of land, who does not see fit to take this precaution.  Suppose the boilers of these two mills are notoriously weak, and all of the employes of both parties are aware of it, and yet they continue to work.  Suppose, now, at the same time and from identically the same cause, a boiler explosion takes place in both mills.  The Clarke County Sawmilling Company would, under the acts of 1898, be mulcted in damages, but the individual would not be liable.

We respectfully submit that ch. 66 of the acts of 1898 cannot be maintained as a reasonable classification, and that it is violative of the fourteenth amendment.

Argued orally by *R. N. Miller* and *T. H. Campbell*, for appellant, and by *M. F. Smith*, for appellee.

WHITFIELD, C. J., delivered the opinion of the court.

We are clearly of the opinion that the stepladder furnished the deceased employe, John W. Ballard, was a wholly unsafe and dangerous appliance ; but it is equally clear that he had knowledge of its dangerous character. Under the common law his suit would, therefore, fail ; but he sues under the provisions of the act of 1898 (Laws of 1898, p. 85, ch. 66). Section 1 is amendatory of ch. 87 of the laws of 1896 (Laws of 1896, p. 97), which itself is amendatory of § 3559 of the code of 1892, which is a mere rescript of sec. 193 of the constitution of 1890.

Section 193 is in these words : "Every employe of any railroad corporation shall have the same rights and remedies, for any injury suffered by him from the act or omission of said corporation or its employes, as are allowed by law to other persons not employes, where the injury results from the negligence of a superior agent or officer; or of a person having the right to control or direct the services of the party injured; and also when the injury results from the negligence of a fellow servant engaged in another department of labor from that of the party injured, or of a fellow servant on another train of cars, or one engaged about another piece of work. Knowledge by any employe injured of the defective or unsafe character or condition of any machinery, ways, or appliances, shall be no defense to an action for injury caused thereby, except as to conductors, or engineers, in charge of dangerous or unsafe cars, or engines voluntarily operated by them. Where death ensues from any injury to employes, the legal or personal representatives of the person injured shall have the same rights and remedies as are allowed by law to such representatives of other persons. Any contract or agreement, express or implied, made by an employe to waive the benefit of this section, shall be null and void ; and this section shall not be construed to deprive any employe of a corporation, or his legal or personal representative, of any legal right or remedy that he

now has by the law of the land.   The legislature may extend
the remedies herein provided for  to any other class of em-
ployes.''

Section 1 of the act of 1898 (Laws 1898, p. 85, ch. 66) is
as follows: '' Section 1.  Be it enacted by the legislature of the
state of Mississippi, that § 3559 of the annotated code of 1892
be amended so that the same shall read as follows, to wit:
Every employe of any corporation shall have the same rights
and remedies for an injury suffered by him from the act or omis-
sion of the corporation or its employes as are allowed by law to
other persons not employes, where the injury results from  the
negligence of a superior agent or officer, or of a person having
the right to control or direct the services of the party injured;
and also when the injury results from the negligence of a
fellow-servant engaged in another department of labor from
that of the party injured, or of a fellow-servant on another
train or cars, or one engaged about a different piece of work.
Knowledge by an employe injured of the defective or unsafe
character or condition of any machinery, ways or appliances,
or of the improper loading of cars, shall not be a defense to an
action for injury caused thereby, except as to conductors or
engineers, in charge of dangerous or unsafe cars, or engines
voluntarily operated by them.   When death ensues from an
injury to an employe an action may be brought in the name
of the widow of such employe for the death of the husband, or
by the husband for the death of his wife, or by the parent for
the death of a child, or in the name of the child for the death
of an only parent, for such damages as may be suffered by
them respectively by reason of such death, the damages to be
for the use of such widow, husband or child, except that in
case the widow should have children the damages shall be
distributed as personal property of the husband.   The legal
or personal representative of the person injured shall have
the same rights and remedies as are allowed by law to such
representatives of other persons.   In every such action the

jury may give such damages as shall be fair and just with reference to the injury resulting from such death to the person suing. Any contract or agreement, expressed or implied, made by any employe to waive the benefit of this section shall be null and void; and this section shall not deprive an employe of a corporation, or his legal or personal representative, of any right or remedy that he now has by law.''

The only effect of the amendment of § 3559 of the code of 1892 is to substitute the words '' any corporation,'' in sec. 1 of said act of 1898, for the words '' a railroad,'' in § 3559, and to add, in sec. 1 of the act of 1898, this clause, '' or of the improper loading of cars.''

Section 193 of the constitution of 1890 was adopted after the decision of the United States supreme court in *Missouri R. R. Co.* v. *Mackey*, 127 U. S., 205 (8 Sup. Ct., 1161; 32 L. Ed., 107), in 1888, and was manifestly intended to authorize legislation along the lines held constitutional in that case—that is to say, to abolish the fellow-servant rule in the case of employes of railroad corporations whose business was known to be inherently dangerous—and the purpose of the last clause of sec. 193 was to extend the remedies therein provided for to any other class of employes of corporations or persons whose business was, like that of railroads, inherently dangerous, or whose business was so different from the business of other corporations or persons as to furnish the basis for a classification of the businesses of such corporations or persons, under which their employes might be permitted to sue without reference to the fellow servant rule, while the employes of corporations, or persons not having that sort of business, could not so sue; in other words, to permit a classification based on '' some difference bearing a reasonable and just relation to the act in respect to which the classification is proposed.'' *Ellis'* *case*, 165 U. S., 150 (17 Sup. Ct., 255; 41 L. Ed., 666). The use of the word '' class,'' in the last clause of sec. 193 of the constitution of 1890, clearly indicates that it was not the

purpose of the section to extend its provisions to all employes of all persons or corporations, but only to such employes of persons or corporations as operated business between which and the business of all other persons or corporations there exists some difference—some substantial difference—such as would be held a warrant for a classification conferring upon such employes of the first class, and denying to employes of the latter class, the benefits of sec. 193 of the constitution. The thought was that a classification might be made, giving to the employes of some corporations and of some persons the right to recover, and denying it to the employes of all other corporations or persons, provided that classification was based upon some distinctive difference between the kinds of business conducted by the one set of corporations or individual employers. Section 193 was itself a special classification of railroad employes, based on the known hazardous character of the operation of railroad cars. It was the direct product of the *Mackey case, supra.* It is not, therefore, to be supposed that the last clause of the section meant any more than that there might be other classifications of the employes of corporations or individual persons, based also on some distinguishing difference in the nature of the businesses. We do not understand the supreme court of the United States, in its many decisions on this subject, to mean that the dangerousness of a particular business would be the only basis for distinguishing between the business of corporations or individual employers in the classification, but rather that any substantial difference between particular businesses which would serve as a reasonable basis for a classification, allowing the employes in the one case to recover, and in the other case not, is sufficient. This we understand to be the doctrine of the *Ellis case,* 165 U. S., 150 (17 Sup. Ct., 255; 41 L. Ed., 666), and of the *McGoun case,* 170 U. S., 293 (18 Sup. Ct., 594; 42 L. Ed., 1037), and of *St. Louis, etc.,* v. *Paul,* 173 U. S., 404 (19 Sup. Ct., 419; L. Ed., 746), in which last case the difference was held to

consist in the fact that the corporation was engaged in a public business, and that the public character of that business made a sufficient difference for upholding that statute. Whilst this case seems an extension of the doctrine of the *Mackey case*, it is clearly an application of the same principle. Neither held that the employes of all could be given this right to recover. One held that the employes of a railroad corporation might be given the right to recover because of the dangerous character of that business; the other, that the employes might recover, under the Arkansas statute involved, because "of the fact that the corporations [railroad] were clothed with a public trust, and discharged duties of public consequence affecting the community at large," it being said, following the supreme court of Arkansas, "that the regulation, as promoting the public interest in the protection of employes, to the limited extent stated, was properly, in the power to amend, reserved under the state constitution." It will be observed that this decision is criticised as pressing the doctrine beyond its utmost legal tension, in a note of Mr. Freeman to this same case at the top of page 181, 62 Am. St. Rep.; but the criticism should be rather of the supreme court of Arkansas than of the United States supreme court, as we shall show later herein.

The act of 1898, under review, is assailed as violating the fourteenth amendment of the constitution of the United States, because it denies, as alleged, to corporations the equal protection of the laws in two respects: First, in that it applies to the employes of all corporations, without reference to any differences in the respective businesses of the corporations; second, because it discriminates between employes of natural persons and of corporations—and the argument is put briefly thus by way of illustration: "Suppose one man has an independent fortune, and has a large body of pine land, say in Clarke county, Mississippi, and being desirous of converting the timber upon these lands into lumber, and recognizing that the sawmill business is hazardous and likely to impose large liability upon

him, he incorporated this business under the name of the Clarke County Sawmilling Company. Alongside of him and his property in Clarke county is an individual owning an equal body of land, who does not see fit to take this precaution. Suppose the boilers of these two sawmills are notoriously weak, and all the employes of both parties are aware of it, and yet they continue to work. Suppose, now, at the same time and from identically the same cause, a boiler explosion takes place in both mills. The Clarke County Sawmilling Company would, under the act of 1898, be mulcted in damages, but the individual would not be liable.'' And it is urged that the act applies to all corporations, but to no natural persons, and, since the natural person and the corporation might be both engaged in precisely the same business, a discrimination in such cases does not rest on any difference in the business. Possibly the clearest statement of the doctrine contended for by appellee is that stated in *Soon Hing* v. *Crowley*, 113 U. S., 708, 709 (5 Sup. Ct., 733; 28 L. Ed., 1145), as follows: '' The discriminations which are open to objection are those where persons engaged in the same business are subject to different restrictions, or are held entitled to different privileges under the came conditions. It is only then that the discrimination can be said to impair that equal right which all can claim in the enforcement of the law.'' It the *Ellis case, supra,* it is said that the classification must always rest upon '' some difference which bears a reasonable and just relation to the act in respect to which the classification is proposed, and can never be made arbitrarily.''

Multiplied citations from the United States supreme court could be made, but the thought running through them all, as we understand them, clearly is that the classification is not to be made, except upon the basis of some difference between the business of those favored and the business of those not favored —a substantial difference warranting the classification. We have read critically all the decisions cited in the briefs from the United States supreme court without finding any decision hold-

ing expressly that a statute providing that the employes of all corporations may so recover can be upheld.   We have read carefully, also, the decisions from the state supreme courts cited, and others not cited, by counsel.   We will quote briefly from a few of these to show that the line of distinction is 'the one we have indicated.

In *Holden* v. *Hardy*, 169 U. S., 393 (18 Sup. Ct., 388; 42 L. Ed., 780), the court says: " While the business of mining coal and manufacturing iron began in Pennsylvania as early as 1716, and in Virginia, North Carolina and Massachusetts even earlier than this, both mining and manufacturing were carried on in such a limited way and by such primitive methods that no special laws were considered necessary, prior to the adoption of the constitution, for the protection of the operatives; but in the vast proportions which these industries have since assumed it has been found that they can no longer be carried on with disregard of the safety and health of those engaged in them, without special protection against the dangers necessarily incident to those employments.   In consequence of this, laws have been enacted in most of the states designed to meet these exigencies, and to secure the safety of persons peculiarly exposed to those dangers.   Within this general category are ordinances providing for fire escapes for hotels, theaters, factories, and other large buildings, a municipal inspection of boilers and appliances designed to secure passengers upon railways and steamboats against dangers necessarily incident to these methods of transportation.   In states where manufacturing is carried on to a large extent, provision is made for the protection of dangerous machinery against accidental contact; for the cleanliness and ventilation of working rooms; for the guarding of well holes, stairways, and elevator shafts, and for the employment of sanitary appliances.   In others, where mining is the principal industry, special provision is made for the shoring up of dangerous walls, for ventilation shafts, bore holes, escapement shafts, means of signaling the surface for supply of

fresh air, and the elimination, as far as possible, of the danger-ous gases; for safe means of hoisting and lowering cages; for a limitation upon the number of persons permitted to enter a cage, and that cages shall be covered; and that there shall be fences and gates around the top of shafts, besides other similar precautions. . . . These statutes have been repeatedly enforced by the courts of the several states, their validity as-sumed, and, so far as we are informed, they have been uni-formly held to be constitutional.''

All the instances set forth here illustrate the principle that the discrimination in favor of certain employes is always based upon some distinctive difference in the business about which they are employed—a difference inhering in the very nature of the business.

In the case of *Smith* v. *Louisville & Nashville R. R. Co.*, 75 Ala., 449, the court says : '' This statute creates an entirely new cause of action—one theretofore unknown. Before its en-actment, February 24, 1872, neither the father nor the mother could recover damages for such killing. Not only does the statute create a new cause of action, but it confines the right to maintain such a suit to the father, if living, and, if not, to the mother. If neither be living, no one else can maintain the suit. And the statute is highly penal in its terms, and must be construed as a penal statute. Is the act copied above con-stitutional? It will be observed that under the statute the action lies only against certain classes—corporations and pri-vate associations of persons. These are held accountable for the wrongful acts and omissions of their officers and agents. Individuals engaged in the same business, having the same de-scription of officers or agents, may cause the death of a minor child by the wrongful act or omission of such officer or agent, and there will be no liability for such death. To illustrate: Manufacturing establishments, in all their extensive variety, mining enterprises, cotton compresses, mills, steam vessels, and even railroads, may be owned and operated without incor-

poration, and by a single proprietor. These are not within the law; and for the death of a minor child, caused by the wrongful act or omission of an agent of such enterprise, neither the father nor the mother can maintain a suit. If, however, there be more owners than one, or if the enterprise be incorporated, then the statute gives a right of action to the father, if living, and to the mother, if he be dead. This precise difference the statute makes, although the character of business and the wrongful act or omission of the agent be in each case the same. How this will work will readily suggest itself. If the employer, being a single individual, be not responsible for the wrongful act or omission of the agent he employs, how can the same act by the same agent employed under the same circumstances, impose a penalty on the innocent employer, merely because two or more owned the business and united in employing the agent? If so, on what principle? Is individual enterprise less amendable to legislative surveillance than associated capital? Within the last twenty years very important constitutional provisions, federal and state, have been adopted. Article 14 of the amendments to the constitution of the United States declares (sec. 1) that 'no state shall . . . deny to any person within its jurisdiction the equal protection of the laws.' Speaking of this provision, Justice Field, of the United States supreme court, in *County of San Mateo* v. *So. P. R. R. Co.*, 8 Am. & Eng. R. R. Cas., 1, said : 'It not only implies the right of each to resort on the same terms with others to the courts of the country for the security of his person and property, the prevention and redress of wrongs, and the enforcement of contracts, but also his exemption from any greater burdens or charges than such as are equally imposed upon all others under like circumstances.' 8 Am. & Eng. R. R. Cas., 1-11, 8 Sawy., 238 (13 Fed., 722). In the case of *Deppe* v. *Chicago, R. I. & P. R. Co.*, 36 Iowa, 54, the court says : 'The defendant asked the court to instruct the jury that the plaintiff, in view of his employment (shoveling dirt at a bank)

at the time of his injury, was not within the purpose and mean-
ing of the act, and hence they should find for the defendant.
This was refused, and thereon arises the first assigned error.
It was said in the case of *McAunich* v. *M. & R. Co.*, 20 Iowa,
338, which was an action by the administratrix of a brakeman:
' If there is an employer and employe, but no business of a
railroad company to be engaged in, then the case is not within
the act. But the same liability is extended by the act, upon
the same terms, to all in the same situation.' And in another
case, decided on the same day (*Ney* v. *D. & S. C. R. Co.*,
*Id.*, 347), it was held that ' in connection with railroads, the
term ' employe ' applies to the conductors, agents, superintend-
ents, and others engaged in operating the road, and the like,
and not to contractors or persons building or constructing the
roadbed, or laying down the ties and rails.' It was under
this construction of the language of the statute, that it was
held constitutional, as before explained.' But if the statute
could be so construed as to apply to all persons in the employ
of railroad corporations, without regard to the business they
were employed in, then it would be a clear case of class legis-
lation, and would not apply upon the same terms to all in the
same situation, and hence would be unconstitutional, and mani-
festly so. To illustrate: Suppose a railroad company employ
several persons to cut timber on its right of way where it is
about to extend its road, and the landowner employs a like
number of persons to cut timber on a strip of equal length
alongside of such right of way. If one of each set of em-
ployes shall be injured by the negligence of a coemploye, and
the employe of the railroad company can, under the statute,
maintain an action against his employer, and the other cannot,
then it is clear that the law does not apply upon the same
terms to all in the same situation. The law, then, would not
have uniform operation, but would be violative of the constitu-
tion, just as much as a law that should prescribe, under the
same circumstances, different liabilities for merchants, for

mechanics, and for laborers. The manifest purpose of the statute was to give its benefits to employes engaged in the hazardous business of operating railroads. When thus limited, it is constitutional; when extended further, it becomes unconstitutional."

We must confess that the argument upholding the constitutionality of the statute before us is exceptionally able, and presents many objections to the view we have stated, but objections all of which we think answerable. For example, it is said, first, that, since the act of 1898 is amendatory of § 3559 of the code, the court would be warranted in limiting the words "any corporation" to such corporations as, like railroads, are engaged in a hazardous business. The argument is that, since § 3559 applies alone to railroads, and since the only pertinent amendment is the change of the words "a railroad" into the words "any corporation," the act retaining bodily the language used in § 3559 as applicable to railroads only, the act of 1898 must mean, in the use of the words "any corporation," any corporation *ejusdem generis* with railroad corporations—corporations of that kind, whose business is hazardous. But the complete answer to this very ingenious suggestion is that the method of amending a statute has been changed by sec. 61 of the constitution, so as to make the whole of the law on the subject appear in the amendment; so that the only form in which we have § 3559 is in sec. 1 of said act of 1898. The language is that "§ 3559 of the code of 1892 be amended so that the same shall read as follows, to-wit: Every employe of any corporation," etc. Section 3559 does not exist in the body of our law, except as set out in sec. 1 of the act of 1898. Another objection to this view is that it would have been extremely easy, if such had been the legislative purpose, to have said, "Every employe of any corporation whose business is inherently dangerous." We think we must read the language as the legislature has written it, and, so read, the legislature clearly meant to extend the

remedy to the employes of all corporations, without reference to any distinction existing between the different business of corporations.

2. In respect to the cases of *Pittsburg, C., C. & St. L. R. Co.* v. *Montgomery*, 152 Ind., 1 (49 N. E., 582; 71 Am. St. Rep., 301), and *Tullis* v. *Lake R. R.*, 175 U. S., 348 (20 Sup. Ct., 136; 44 L. Ed., 192), it is very earnestly insisted that the *Tullis case*, 175 U. S., 350 (20 Sup. Ct., 136; 44 L. Ed., 192), upholds the view that a statute like this, applicable to all corporations, is not unconstitutional; and it is said that these two cases further uphold the view that the court may, by a process of judicial inclusion and exclusion, look to the evidence in each case to determine in that way —from the evidence, showing the nature of the business—whether any particular corporation falls within or without the constitutional line of demarkation. This argument for appellant is put with such clearness and power that we do not think the presentation could be improved upon, and so we quote it entire.    Says learned counsel:

" The mere fact that natural persons are not included in the act does not render it obnoxious to the provisions of the fourteenth amendment.    If so, why does the supreme court, in the case of *Tullis* v. *Lake R. R. Co.*, 175 U. S., 348 (20 Sup. Ct., 136; 44 L. Ed., 192), uphold almost a similar statute as to railroads ?    The language of the Indiana act was ' Railroad and other corporations.'    It did not include individuals.    There are a number of individuals in the United States who have the means to operate railroads, and doubtless there are instances where railroads are owned and operated by individuals; yet the supreme court of the United States, in the above cited case, holds such legislation as is under consideration now not in contravention of the constitution.    The illustration of opposing counsel will apply just as forcibly to an individual operating a railroad as it does to a sawmill and commercial corporation. The case of *Tullis* v. *Lake R. R. Co.*, 175 U. S., 348 (20 Sup. Ct., 136; 44 L. Ed., 192), is, we think, in point to up-

hold the constitutionality of the act under consideration. While
the court does use the language that, considering the act of In-
diana as applying only to railroad corporations, it cannot be
regarded as in conflict with the fourteenth amendment, yet it is
evident that the court intended to convey the idea that it was
not called upon to consider it, except so far as railroad corpo-
rations were concerned, and it is not to be taken at all as an in-
timation that it would hold the act of Indiana unconstitutional
as to other corporations.    The only ground upon which counsel
attacks the act of 1898 is that it does not extend its provisions
to natural persons, and therefore it is class legislation; and the
court, in its order remanding the case, seems to intimate that
the fact that natural persons are not included in the act would
render it unconstitutional, as it applies to all corporations and
to no natural persons.    But on this point the case of *Tullis* v.
*Lake R. R. Co.*, 175 U. S., 348 (20 Sup. Ct., 136; 44 L. Ed.,
192), it seems to me, is decisive.    If the fact that the omission
from the act of natural persons would render the act in conflict
with the fourteenth amendment, then the court would have
said that the act imposed liabilities and restrictions upon cor-
porations operating railroads, but did not impose the same lia-
bilities and restrictions upon natural persons operating rail-
roads, and was therefore unconstitutional.    If the addition of
the words ' natural persons ' to the act of 1898 under consider-
ation would make it consistent with the provisions of the four-
teenth amendment, as the court would seem to think, and coun-
sel for appellee undoubtedly think, then the omission of the
words ' natural persons ' from the Indiana act construed in
*Tullis* v. *Lake R. R. Co.*, *supra*, should certainly have ren-
dered the Indiana act obnoxious to the fourteenth amendment;
yet the supreme court of the United States did not so hold.    It
seems to me there is no escape from this argument.    .    .    .
At first thought I was impressed with the fact that it was ab-
surd to make the constitutionality of the act depend upon the
evidence deduced in each particular case; but after considering .

the matter I have come to the conclusion that that is what the court or legislature does when it says, as it did in *Tullis* v. *Lake R. R. Co.*, 175 U. S., 348 (20 Sup. Ct., 136; 44 L. Ed., 192), that the business was dangerous. The act simply says 'railroad corporations,' and the court says that the legislature had the right to restrict such corporations in their dealings with their employes, because of the dangerous and hazardous character of the employment and business in which such corporations are engaged. But how do you know that railroad corporations are engaged in a dangerous and hazardous business? You must know it either as a matter of general knowledge or from the testimony of witnesses in any particular case. If the court takes cognizance from general knowledge that a railroad corporation is engaged in a dangerous and hazardous business to its employes, why can it not take notice from general knowledge that a corporation engaged in the manufacture of oil from cotton seed, or of furniture from various woods, is engaged in a hazardous business? If the court does not know this of its own general knowledge, what is the objection to ascertaining it from the facts of each particular case as testified to by witnesses? It would be impossible for the legislature to have enumerated, *eo nomine*, each and every corporation to which it is intended the act should apply. If it did not do this, then there were only two courses to pursue: To say 'all corporations using the dangerous agency of steam in operating its machinery.' Then the court would have to take cognizance from general knowledge that any specific corporation, from its name or the character of its business, used steam in operating its machinery, or else would have to inform itself as to this from testimony of witnesses in any given case. If the legislature should pursue the only other course, to wit, of saying 'any corporation,' and the court should deem that there might be some corporation to which it would be unconstitutional to apply such an act, then what is the objection to determining, either from general knowledge or the specific testimony of wit-

nesses, that such corporation falls within the terms of the act, constitutionally or unconstitutionally, according to the fact whether or not it is engaged in a business hazardous and dangerous to its employes?"

We, however, think the meaning of the *Tullis case* is distinctly that, if the Indiana statute had not had in it, on its face, the words "railroad corporations," it would have been held by the supreme court of the United States unconstitutional. It is true the objection in that case was made that it was unconstitutional because the language, "railroad corporations and other corporations," was exactly equivalent to the words, "all corporations," which would present a statute just like ours. But it is to be distinctly noted that the Indiana supreme court held, and the United States supreme court counted on that holding, that that objection could not be made by a railroad company; in other words, the Indiana supreme court declined to entertain the objection, since the party making the objection was a railroad corporation, and the supreme court of the United States accepted the state supreme court's construction of its state's statute. The words "railroad corporation" appearing also on the face of the statute, as to the objection that individuals own railroads, and that consequently the supreme court of the United States, in *Tullis case, supra*, must be assumed to have held that such legislation is valid, though applying to corporations owning railroads, and not to individuals owning railroads, although both are in exactly the same business, we must confess that it is extremely difficult to make answer for the supreme court of the United States. It may be that the instances of individual ownership of interests so vast as railroad interests usually are, are so very rare as not to have been thought worthy by the supreme court of the United States of special consideration, though this surely ought not to affect the principle. At all events, it is too plain for debate that in all the decisions of the federal supreme court the ground on which such legislation as this has been vindicated in some essential

and substantial difference between the businesses of the corporations favored and the businesses of the corporations discriminated against.

3. But the most difficult proposition to answer, made by learned counsel for appellant, is this: that the supreme court of the United States, in *Chicago R. R. Co.* v. *Pontius*, 157 U. S., 209 (15 Sup. Ct., 585; 39 L. Ed., 675), held that, in severing the unconstitutional from the constitutional parts of a statute, a court may, although the language of the statute clearly embraces all corporations, affect such severance, by looking to the evidence in each particular case, and thus "judicially excluding or including" a particular corporation, according as the evidence in each case may show that the business of such corporation does, or does not, bring it within the purview of the statute. The statute of Kansas in that case is as follows: "Every railroad company organized or doing business in this state shall be liable for all damages done to any employe of such company, in consequence of any negligence of its agents, or by any mismanagement of its engineers, or employes, to any person sustaining such damages." And the court said: "It is now contended that the plaintiff was a bridge builder; that this legislation only applied to employes exposed to the peculiar hazards incident to the use and operation of railroads; that the railroad could not be subjected to any greater liability to its employes who were engaged in building its bridges than any other private individual or corporation engaged in the same business; and that the statute had been so construed in this case as to make the company liable to its employes when engaged in building its bridges, notwithstanding bridge building was not accompanied, and had not been treated by such legislation as accompanied, by peculiar perils, thus discriminating against the particular corporation, irrespective of the character of the employment, in contravention of the fourteenth amendment. But the difficulty with the argument is that the supreme court found upon the facts that,

although the plaintiff's general employment was that of a bridge carpenter, he was engaged at the time the accident occurred, not in building a bridge, but in loading timber on a car for transportation over the line of defendant's road; and *Mo. P. R. R. Co.* v. *Haley*, 25 Kan., 35; *Union Pac. R. R. Co.* v. *Harris*, 33 Kan., 416 (6 Pac., 571), and *Atchison, T. & S. F. R. R. Co.* v. *Koehler*, 37 Kan., 463 (15 Pac., 567), were cited, in which cases it was held that a person employed upon a construction train to carry water for the men working with the train, and to gather up tools and put them in the caboose or tool car, a section man employed by a railroad company to repair its roadbed, and to take up old rails out of its track and put in new ones, and a person injured while loading rails on a car to be taken to other portions of company's road, were all within the provisions of the act in question, and the court said: ' In this case the plaintiff was injured while on a car assisting in loading timbers to be transported over defendant's road to some other point. The mere fact that the plaintiff's regular employment was a bridge carpenter does not affect the case, nor does it matter that the road was newly constructed, or whether it was in regular operation or not. The injury happened to the plaintiff while he was engaged in labor directly connected with the operation of the road, and the statute applies, even though it should be given the construction counsel places on it.' And see *Chicago, Rock I. & P. R. R. Co.* v. *Stahley*, 62 Fed. Rep., 363 (11 C. C. A., 88)."

It is certainly true that in the cases cited from Kansas, as also the case we have heretofore referred to of Deppe, *supra*, and also in the two cases of *McAunich* and *Ney* v. *R. R. Co.*, 20 Iowa, 338, 347, the court did look to the evidence to see whether the person suing was or was not an employe, and further, whether, though an employe, he was such an employe as was actually engaged at the time in the operative service of the railroad—that is, service connected with the running of the cars. It might be said that the thing which distinguishes that

statute from ours is that in the Kansas statute and the Iowa statute the words "railroad company" appear on the face of the statute, and that in all these cases from Kansas and Iowa the courts had, therefore, statutes on the face of which the words "railroad company" appeared, and that as the court judicially knew that the business of railroading was a hazardous business, inherently such, and as the statute was hence the exact equivalent of a statute framed thus, "Every employe of any corporation or individual whose business is inherently dangerous," therefore all the court did was to see, from the evidence, whether the employe was an employe of a railroad corporation—that is, equivalently, of a corporation whose business was inherently dangerous. In other words, those courts might say—and this would be the controlling thought on that view—that they found the boundary by which to sever in the language of the statute itself, "railroad company," and all that they looked to the evidence for was to be sure that the particular employe was an employe of the kind of corporation named in the statute; and hence those courts would say that in none of these decisions did the court sever the unconstitutional provisions of the statute from the constitutional by looking to the evidence, but solely by the words "railroad company" found on the face of the statutes.

We have said that above line of thought might be indulged in for the purpose of supporting the decisions of the supreme courts of Kansas and Iowa in the construction of their statutes. And we may say that that line of thought might also be invoked in the hope of supporting the following cases: *Leep* v. *St. Louis, I. M. & S. R. R. Co.*, 58 Ark., 407 (25 S. W., 75; 23 L. R. A., 264; 41 Am. St. Rep., 109) and *St. Louis, etc.*, v. *Paul*, 64 Ark., 83 (40 S. W., 705; 37 L. R. A., 504; 62 Am. St. Rep., 154), and also *Minneapolis & St. L. R. R. Co.* v. *Herrick*, from Minnesota, affirmed, 127 U. S., 210 (8 Sup. Ct., 1176; 32 L. Ed., 109), and *Chicago R. R.* v. *Pontius*, 157 U. S., 209 (15 Sup. Ct., 585;

39 L. Ed., 675), affirmed from the supreme court of Kansas.
But, with all deference, it is impossible for us to regard any
of these decisions as sound on this point.    The court did not,
in those cases, sever the statute, so as to divide constitutional
provisions from unconstitutional provisions.    The act of the
court in each and every one of these cases was distinctly not a
severance of a statute, separating constitutional from unconsti-
tutional provisions in the statute, all of the provisions appear-
ing upon the face of the statute.    The act of the court was an
alleged judicial limitation of general words in a statute, by the
evidence in each case, so as to hold one employe within and
another employe without such general words.    Limitation by
judicial construction is not severance of a statute.    Severance
of a statute takes place only where both sets of provisions,
constitutional and unconstitutional, appear upon the face of the
statute itself, and the court separates, if the provisions are not
interdependent, the constitutional from the unconstitutional,
and strikes from the statute the unconstitutional provisions,
leaving the constitutional provisions in the statute.    But where,
as in all these cases, there are just two general words, "any
employe," what the court does is simply to look to the evidence
in each case, and from that evidence determine, not from the
provisions on the face of the statute, whether the particular
employe is or is not the kind of employe falling within the
supposed, not the declared, intent of the act, that furnishes a
case, not for a severance of a statute, but for the limitation, by
alleged judicial construction of general words, by the evidence
in the case.    We say alleged judicial construction.    We think
it is judicial legislation.    The latter—that is to say, the so-
called limitation by judicial construction; judicial legislation as
we conceive it—is never permissible.    And hence we think all
the decisions we have referred to on this point clearly unsound.
The difficulty is in finding the true test as to when a statute
may be severed.    That test clearly is this:    That whenever the
court finds on the face of a statute a number of different pro-

visions, some constitutional and some unconstitutional, there it may sever, if they be not interdependent, between these provisions, striking out the unconstitutional; and, let it be marked, that in every such case there is something to sever between on the face of the statute. That is what is meant by the severance of a statute. But wherever a court, in order to uphold the provisions of a statute as constitutional, has to interpolate in such statute provisions not put there by the legislature, in order, by such interpolation, to make the provision which the legislature did put there constitutional, this is no case of severance in any proper legal sense; nor is it in any legal or logical sense a proper limitation of the provisions which are in a statute by judicial construction. Such action by a court is nothing less than judicial legislation pure and simple.

That we have stated the true test clearly appears from two decisions of the United States supreme court: The first, *United States* v. *Reese*, 92 U. S. 214, 23 L. Ed., 566, where the court say, as to the test of severance of a statute, " the proposed effect is not to be attained by striking out, or disregarding the words that are in the section, but by inserting those which are not now there. The question, then, to be determined, is whether we can introduce words of limitation into a penal statute, so as to make it specific, when, as expressed, it is general only. It would certainly be dangerous if the legislature could set a net large enough to catch all possible offenders, and leave it to the courts to step inside, and say who could be rightly detained, and who could be set at large. This would, to some extent, substitute the judicial for the legislative department of the government." And consult carefully the cases cited, referring to the *Reese case,* set out in Rose's notes at p. 789. The other case, not referred to by any of the counsel is the case of *Baldwin* v. *Franks,* 120 U. S., at pp. 685–690 (7 Sup. Ct., 656, 763; 32 L. Ed., 766), to which we call critical attention. The court say: " In *United States* v. *Harris,* 106 U. S., 629 (1

Sup. Ct., 601; 27 L. Ed., 290), it was decided that this section was unconstitutional, as a provision for the punishment of conspiracies of the character therein mentioned, within a state. It is now said, however, that in that case the conspiracy charged was by persons in a state, against a citizen of the United States and of the state, to deprive him of the protection he was entitled to under the laws of that state, no special rights or privileges arising under the constitution, laws, or treaties of the United States being involved; and it is argued that, although the section be valid so far as such an offense is concerned, it is good for the punishment of those who conspire to deprive aliens of the rights guaranteed to them in a state by the treaties of the United States. In support of this argument, reliance is had on the well-settled rule that a statute may be in part constitutional, and in part unconstitutional, and that, under some circumstances, the part which is constitutional will be enforced, and only that which is unconstitutional rejected. To give effect to this rule, however, the parts—that which is constitutional, and that which is unconstitutional—must be capable of separation, so that each may be read by itself. This statute, considered as a statute punishing conspiracies in a state, is not of that character; for in that connection it has no parts, within the meaning of the rule. Whether it is separable, so that it can be enforced in a territory, though not in a state, is quite another question, and one that we are not now called on to decide. It provides, in general terms, for the punishment of all those who conspire for the purpose of depriving any person, or any class of persons, of the legal protection of the laws, or of equal privileges or immunities under the laws. A single provision [like the two words in this statute], which makes up the whole section, embraces those who conspire against citizens, as well as those who conspire against aliens—those who conspire to deprive one of his rights under the laws of a state, and those who conspire to deprive him of his rights under the constitution, laws, or treaties of the United States. The limi-

tation which is sought must be made, if at all, by construction, not by separation. This, it has often been decided, is not enough.''

This language is decisive of the unsoundness of the view taken by the supreme courts of Iowa, Kansas, Arkansas, and Ohio, cited above. But, it may be said, were not all these cases affirmed by the supreme court of the United States? Certainly. But why? That is made extremely plain by the supreme court of the United States in *Tullis* v. *R. R.*, 175 U. S. 348, 44 L. Ed., at page 194, and *Waters-Pierce Oil Co.* v. *Texas*, 177 U. S., 28 (20 Sup. Ct., 518; 44 L. Ed., 657). Chief Justice Fuller in the former says the supreme court of the United States accepted the construction of the Arkansas supreme court '' because that court had so decided,'' and also distinctly says that the decision of the supreme court of Indiana in *Pittsburg, C., C. & St. L. R. Co.* v. *Montgomery*, 152 Ind., 1 (49 N. E., 582; 71 Am. St. Rep., 301), was affirmed because the supreme court of the United States was bound to accept the construction put upon an Indiana statute by the supreme court of Indiana. The very point expressly argued in the *Tullis case* was that the supreme court of the United States should hold the Indiana statute unconstitutional, notwithstanding the decision on the Kansas, Iowa, and Ohio statutes, because of the particular phraseology of the Indiana statute; but Chief Justice Fuller said that that view asked the United States supreme court '' to disregard the interpretation of a state statute by the court of last resort of a state, and, by adverse construction, to decide that the state law was repugnant to the constitution of the United States. But,'' said the Chief Justice, ''the elementary rule is that this court accepts the interpretion of a statute of a state affixed by the court of last resort thereto.'' And so, in *Waters-Pierce Oil Co.* v. *Texas*, the court was asked to apply the doctrine of the *Reese, Harris,* and *Franks'* cases to the Texas statute, and hold it violative of the fourteenth amendment. This statute provided: '' Every foreign corporation

violating any of the provisions of this act," etc., just as the
Kansas and other statutes had said "railroad corporations"
should be liable to all their employes, without reference to
whether engaged in its operative service or not.   The Texas
Court of Civil Appeals held that they could separate this lan-
guage, "any of the provisions of this act," into such pro-
visions as related to local commerce, and such as related to in-
terstate commerce, and so upheld their act.   Clearly this was
no severance of the act.   It was putting into the act words not
there.   It was determining by the evidence in each case, whether
the commerce was local or interstate.   And hence the earnest
insistence for the application of the doctrine of the *Reese* and
other cases cited above.   But what was the reply of the United
States supreme court?   That in those cases the interpretation
of certain statutes of the United States was involved, and that
the supreme court of the United States, interpreting them and
expressing its own opinion originally, as to whether this sort
of so-called severence could be indulged in, distinctly held that
it could not; but that, if the Texas court of civil appeals chose
to put that sort of construction on its statute, the United States
supreme court was bound to accept that construction, and had
no power to do any more than to determine whether the statute,
so construed, violated the fourteenth amendment.   Says Jus-
tice McKenna, speaking for the court: "The courts of Texas
have like power of interpreting the statutes of Texas.   What
they say the statutes of that state mean, we must accept them
to mean, whether it is declared by limiting the objects of their
general language, or by separating their provisions into valid
or invalid parts,"—citing the very cases we have just referred
to, the *Tullis case* and the *Paul case*.

It is perfectly obvious to our minds, from the *Reese case*, and
*Harris case*, and the *Franks case*, on the penal and criminal
side of the law, as well as from *Keokuk Packet Co.* v. *City of
Keokuk*, 24, 95 U. S. 80, L. Ed., 377, and the many cases referred
to in Judge Rose's notes in the appendix to that volume, citing the

*Keokuk case*, on the civil side of the law, that the supreme court of the United States distinctly holds, as its own view, that the sort of severance, or the sort of so-called limitation by judicial construction, where the court determines, by the evidence in each case, is not allowable. The distinction is put, as we have stated, in the clearest possible form in the *Franks* and *Reese cases, supra.* Counsel relies on this *Keokuk case*, strongly, to show that there is a difference, as to the application of the principle we are discussing, between penal or criminal statutes and civil statutes. The language of Justice Strong at the conclusion of the opinion is very broad; but it is perfectly plain, when the facts are looked to, that severance could be had between two provisions in the statute. One provided that all water craft landing at an improved wharf should pay certain wharfage fees. Another independent section provided that all water craft landing at any part of Water street, for a distance of six and one-half miles, should pay wharfage fees, whether there was any wharf there or not. The court held that it was constitutional to require fees for landing at an improved wharf, but not to require fees of a boat landing on the banks of the river; and, as both sections were on the face of statute, the court simply severed between them, and struck out the unconstitutional section. That was a perfectly proper application of the doctrine of severance between the provisions of the statute. And so, in the case of *Chicago, etc.* v. *Jones* (Ill.), 37 N. E., 247 (24 L. R. A., 141; 41 Am. St. Rep., 293) counsel will clearly see that the statute had two sets of provisions. One related to unjust discrimination in transportation charges; the other, to extortionate charges. The supreme court of Illinois accordingly severed the unjust discrimination sections from the sections as to extortion, striking from the statute the unjust discrimination sections which had been held unconstitutional. Here, again, both sets of provisions appeared on the face of the statute, and it was a proper case for severance. In a word, learned counsel will not fail to see, upon a

critical examination of· all the cases upon the subject, that there never can be any room for the application of the doctrine as to severing a statute, except in those cases where the constitutional provisions, as well as the unconstitutional provisions, both appear on the face of the statute, and that, wherever a court in order to make a severance has to insert in a statute words or provisions not put there by the legislature, it is guilty simply of judicial legislation.

We wish to call special attention to the further fact that we are not alone in the criticisms we have indulged in, as to certain courts above. Mr. Freeman, perhaps the profoundest law analysist living, in a most able note to *St. Louis R. R. Co.* v. *Paul*, 62 Am. St. Rep., at top of p. 181, distinctly states it as his view that the *Leep case, supra,* and other like cases, cannot be upheld. His criticism seems to be rather of the supreme court of the United States for affirming those decisions; but, as said in the first part of this opinion, his criticism should not have been of that court, but of the state supreme courts, for the construction placed by them upon the statutes of their respective states. As pointed out in the *Tullis case,* and the *Waters-Pierce Oil Co. case, supra,* the United States supreme court was helpless, being bound by the construction adopted by the said state supreme courts, and, as we have pointed out, took special pains to say that it affirmed the cases simply because· it was so bound. It is said, and correctly, that if we were to place upon this statute the construction that the legislature only meant such corporations as had a business inherently dangerous, the supreme court of the United States would be bound to accept that construction, and, accepting it, would undoubtedly affirm our judgment. But we must carefully ascertain, and fearlessly uphold, in every case, the conclusion which, on our consciences, we think clearly right, without reference to results in a higher tribunal. This court neither· seeks affirmance, nor fears reversal, at the hands of the United States supreme court. It is concerned alone to

find the right, and to maintain it. Of course, if the cases invoked by the very able counsel for appellant from the United States supreme court maintained the doctrine that a statute like this, using the words "any corporation," could be either severed, or limited, by the so-called judicial construction, restraining its general terms by the evidence in each case, so as to exclude, or include, according to the testimony in each varying case—that is to say, if that court had meant and declared that doctrine as the original view of that court—we would be bound to accept that view, since that court is an appellate court from this, where federal questions are involved. But it is made by the United States supreme court perfectly plain that the original view of that court, on this subject of severance and limitation by judicial construction, is utterly at war with the view of the courts we have quoted from, as explicitly declared in the *Franks*, *Harris* and *Reese cases*, *supra*, and that all those cases were affirmed by the supreme court of the United States because, and only because, it was compelled to accept the construction placed by the respective state supreme courts upon the statutes of their states, and had no power, such construction being accepted, to decide anything else, except the question whether those various statutes, so construed, violated the fourteenth amendment.

But, fourth, it is objected that in the *Mackey case* the supreme court of the United States distinctly held that it was exclusively within legislative discretion whether these liabilities "should be applied to common carriers by canal and stage coach, and to persons and corporations using steam in manufactories;" and it is said that there is nothing inherently dangerous in the business of a canal carrier, or of a stage coach. Whether this is true as applied to canals is not so clear. It does seem difficult to find any inherent danger in the business of stage coaching; but, as we have heretofore remarked, we do not understand the dangerousness of a business to be the only distinctive difference on which such statutes may be upheld.

On the contrary, we understand the United States supreme court to hold that such statutes may be upheld, if they are based in their classification upon any substantial and essential differences between the natures of the businesses of the favored corporations or individual employers and the natures of the businesses of all other corporations or individual employers. It may be further said, very properly, that what the supreme court said about canals and stage coaches was quoted from the Iowa supreme court, and was clearly *obiter dicta.*

·5. It is objected, that the United States supreme court decisions would uphold this statute upon the ground that it is perfectly competent to confer upon the employes of all corporations these remedies and rights, whilst denying them to natural persons, because, and only because, of the fact that they are corporations, the creatures of the state, existing and drawing all their vast privileges from the state. It is said that these considerations constitute such a great difference between the natural person and the corporation as to uphold such legislation. And the *Ellis case*, 165 U. S., 150 (17 Sup. Ct., 255; 41 L. Ed., 666), is cited; the court saying there "that it was a sufficient answer, in that case, to the argument that the act would be valid if it extended the penalties to all corporations, and that as a matter of fact that statute did not so extend the penalties to all corporations." But this is far from decision to that effect. It is a mere comment arguendo.

Again, it is said that in *Pac. Express Co.* v, *Seibert*, 142 U. S., 352 (12 Sup. Ct., 250; 35 L. Ed., 1035), it was held that "the constitution is not violated by special legislation, applied equally to artificial bodies;" and numerous cases are cited from Judge Rose's notes on this case to sustain this proposition. But the perfect answer to this is that all these are cases as to the power of taxation, a subject wholly different from that under investigation here. And this distinction is clearly pointed out in *Connelly* v. *Union Pipe Co.*, 184 U. S., 562 (22 Sup. Ct., 440; 46 L. Ed., 679), where the court says: "It is

sufficient to say that those cases had reference to the taxing power of the state, and involved considerations that could not, in the nature of things, apply to a state enactment like the one involved in the present case. . A state may, in its wisdom, classify property for the purposes of taxation, and the exercise of its discretion is not to be questioned in a court of the United States so long as the classification does not invade the rights secured by the constitution of the United States. But a different consideration controls when a state by legislation seeks to regulate the enjoyment of rights and the persuit of callings connected with domestic trade.''

Finally, in aid of our view, we refer to the fact that chapter 65, p. 82, of the acts of 1898, which consolidated the rights of action given by § 663 of the code of 1892, expressly uses, as it ought to have done, the words ''person or corporation.'' It provides: '' Whenever the death of any person shall be caused by any wrongful or negligent act or omission, or by such unsafe character, ways or appliances, as would, if death had not ensued, have entitled the party injured or damaged thereby to. maintain an action and recover damages in respect thereof, and such deceased person shall have left a widow or children, or both, or husband, or father, or mother, or sister, or brother, the person or corporation,'' etc.

Our conclusion, after the most careful and protracted consideration, is that section 1 of the act of 1898 (acts 1898, p. 85, ch. 66), violates the fourteenth amendment of the constitution of the United States in that it imposes restrictions upon all corporations, without reference to any difference arising out of the natures of their businesses, which are not imposed upon natural persons, and thus denies to corporations the equal protection of the law. We are, therefore, constrained to declare the said act unconstitutional. The legislature, soon to meet, can readily frame an appropriate act not open to these objections.

The arguments in this case, on both sides, are so exception
ally able that the reporter is directed to report them in full.

*Affirmed.*